# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WASHINGTON

# AT SEATTLE

| | | |
|---|---|---|
| JOSHUA A. DIEMERT, an individual, | ) | Civil Action No. 2:22-cv-01640 |
| Plaintiff, | ) | |
| v. | ) | **COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES** |
| THE CITY OF SEATTLE, a municipal Corporation; BRUCE HARRELL, in his official capacity as the Mayor of the City of Seattle, | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.    Joshua Diemert began his employment with the City of Seattle in 2013. He was excited to use his skills and expertise to serve vulnerable and marginalized communities as a social worker in Seattle's Human Services Department (HSD). As a devoted father with a background in government work, Mr. Diemert believed his new job would provide stability for his family.

2.    Mr. Diemert quickly developed good relationships across several City departments and excelled. During his first year, he received the HSD's "maximum achievement" award. But alongside that positive experience, Mr. Diemert began to understand that his race would negatively impact not only his day-to-day work life, but his opportunities for career advancement.

Complaint - 1
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

3.      That his race would be an albatross around his neck is a deliberate outgrowth of the City's Race and Social Justice Initiative (RSJI). The RSJI is a city-wide program that requires race-based thinking and decision-making in an effort to end "structural racism." Paramount within the RSJI are the tenets that white male individuals like Mr. Diemert "are bolstered by racism," that they "internalize it," and that "individuals, institutions, and communities are often unconsciously and habitually rewarded for supporting white privilege and power."

4.      As his career developed, the discrimination at HSD became increasingly pervasive and hostile. The City routinely urged Mr. Diemert to join race-based affinity groups and required him to participate in training sessions that demeaned and degraded him based on his racial and ethnic identity. He was chastised and punished for combatting racially discriminatory hiring practices by HSD colleagues. And he was denied opportunities for advancement by the City based on his racial and ethnic identity. His supervisors and other colleagues continually dismissed his concerns over a period of years and claimed he could not be a victim of racism and discrimination because he possessed "white privilege."

5.      This discrimination had a significantly negative impact on Mr. Diemert's mental and physical health.

6.      Accordingly, Mr. Diemert brings this action under the Equal Protection Clause of the Fourteenth Amendment and Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq*., to vindicate his rights, seek compensation for his injuries, and to prevent the City of Seattle from treating individuals differently because of their race.

## JURISDICTION AND VENUE

7.      This case arises directly under the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq*.

8.      The Court has jurisdiction over the complaint under 28 U.S.C. §§ 1331 and 1343.

9.      This Court has authority to issue a declaratory judgment, attorneys' fees, and other necessary and proper relief under 28 U.S.C. §§ 2201 and 2202.

Complaint - 2
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

10. Venue is proper in this Court under 28 U.S.C. § 1391 as the acts or omissions giving rise to the claims of this suit occurred in the City of Seattle.

## PARTIES

11. Plaintiff Joshua A. Diemert is a former City of Seattle employee who worked as a program intake representative in the City of Seattle's Department of Human Services from January 2013 to September 2021.

12. Defendant City of Seattle is a municipality created under the laws of the State of Washington. The Seattle City Council is its governing body. The City of Seattle is an employer within the meaning of 42 U.S.C. § 2000e(b).

13. Defendant Bruce Harrell is the Mayor of Seattle. As Mayor, he collaborates with the City Council, City Departments, Race and Social Justice Initiative Coordinating Team, and the Race and Social Justice Initiative Sub-Cabinet to implement and enforce the Race and Social Justice Initiative across all City functions.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14. On December 23, 2020, Mr. Diemert filed a charge of retaliation and discrimination on the basis of race, color, sex, and national origin with the U.S. Equal Employment Opportunity Commission (EEOC) (No. 551-2020-04009). *See* **Exh. 1**.

15. On January 16, 2021, Mr. Diemert also filed an amended charge of retaliation and discrimination on the basis of race, color, sex, and national origin with the EEOC. *See* **Exh. 2**.

16. On June 30, 2022, Mr. Diemert filed an additional charge with the EEOC (No. 551-2022-05568), detailing additional, continuing acts of discrimination he experienced between December 23, 2020, and September 7, 2021. *See* **Exh. 3**.

17. Mr. Diemert received the Notice of Right to Sue for charge 551-2020-04009 (Notice 04009) on August 19, 2022. The EEOC issued a corrected Notice of Right to Sue on August 22, 2022. *See* **Exh. 4.**

18. Mr. Diemert received the Notice of Right to Sue for charge 551-2022-05568 on November 15, 2022. *See* **Exh. 5**.

Complaint - 3
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

19.     Therefore, this suit is timely filed within the 90 days allowed from the receipt of both Right to Sue letters.

20.     The racially hostile work environment persisted both before and after filing the initial EEOC Charge (No. 551-2020-04009).

21.     All required conditions precedent under Title VII (42 U.S.C. § 2000e, *et seq*.) have been exhausted and/or performed by Mr. Diemert before filing this complaint.

## FACTUAL BACKGROUND

**A.     Mr. Diemert's Employment with the City of Seattle**

22.     Plaintiff Joshua Diemert is a former City of Seattle employee. Seattle classifies Mr. Diemert as a white male.

23.     Mr. Diemert was hired in January 2013 as a full-time program intake representative in the Human Services Department. He remained in this position from January 2013 until September 2021; the only exception being from 2016 to March 2017, when Mr. Diemert served in a "lead" role in the HSD.

24.     Mr. Diemert had been working as a "lead" in HSD since 2014, but he only received a slight pay increase and title change from 2016 until he was forced to resign from the role in March 2017.

25.     As he began working, Mr. Diemert was in high demand across several City departments. In 2014, he obtained a "maximum achievement" award. This is awarded to HSD employees whose "performance and efforts have made a noticeable difference to their colleagues, the Department and/or the clients and communities" served.

26.     Mr. Diemert was instrumental in creating and developing an electronic database for the City. He also helped launch the Vehicle License Fee Rebate Program and assisted with the creation of an internal rules and policies handbook for the Utility Discount Program. Both projects were done in addition to Mr. Diemert's regular job duties and responsibilities.

27.     When Mr. Diemert was serving in a "lead" position in HSD in 2016, he repeatedly informed his supervisors that the role of the position had changed and that the amount of work had drastically increased. It was also around this time that Mr. Diemert was managing a chronic medical issue and taking FMLA leave.

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

28.     In or around April of 2017, Mr. Diemert's supervisor Tina Inay (Supervisor Inay) refused to give him any assistance, telling him that he should step down because his FMLA needs conflicted with "business needs." Moreover, she berated Mr. Diemert for using his "white privilege" to keep the position and told him he was responsible for denying a "person of color" an opportunity for promotion.

29.     At first, Mr. Diemert did not step down from his "lead" position, and met with Brian Sharkey, the Deputy Director of Human Resources, Finance and Administrative Services, to discuss Ms. Inay's verbal abuse. However, Mr. Diemert did not receive any support as Mr. Sharkey supported Supervisor Inay's racial views.

30.     As a result of Supervisor Inay's unrelenting coercion and racial harassment, Mr. Sharkey's lack of support, and with Mr. Diemert's own health in the balance, Mr. Diemert stepped down from the "lead" position he valued despite faithfully fulfilling his job duties. Based on the explicit discussions of his race by management, Mr. Diemert was punished for taking FMLA leave because of his race and the City coerced him to resign from his supervisory role in order to fill the "lead" position according to the racially discriminatory objectives of the City's Race and Social Justice Initiative.

31.     Moreover, City documents reveal that Mr. Diemert's position was not renewed, and it was terminated before the full expiration of the position. Instead, the City waited until Mr. Diemert had stepped down to follow his recommendation to divide the work of the lead position among two people. Not only did the Department promote two people of color with no supervisory experience, Shamsu Said (Mr. Said) and Trinh Nguyen (Ms. Nguyen) but the Department required Mr. Diemert assist both leads for over a year since neither knew the program rules or how to perform the functions of their new jobs.

32.     Mr. Said and Ms. Nguyen were selected over Mr. Diemert because of their race.

### B.     Seattle's Race and Social Justice Initiative

33.     The Race and Social Justice Initiative is a citywide effort that purports to end institutional racism in City government, and to achieve racial equity.

Complaint - 5
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

34. The Race and Social Justice Initiative is based on the foundational premise that American society has "internalized and normalized" culture and practices that are "rooted in white supremacy, colonialism, classism, Christian hegemony, sexism, heterosexism, physical ableism, mental health oppression, all of the above or other systems of oppression." *See* **Exh. 6**.

35. The RSJI aims to end American culture because it was created by "white, wealthy, Christian, cis-gender, straight, non-disabled men coming from Europe who wanted to protect their place within hierarchy and empire." In its place, it seeks to create a "relational culture" that "interrupt[s] the many overlapping aspects of white supremacy culture." ***Id.***

36. Traits such as "individualism," "perfectionism," a "sense of urgency," and "objectivity" are based in "white supremacy culture" and need to be rooted out. *See **Id.***

37. Since 2005, all City departments have developed and implemented annual RSJI work plans and City employees are encouraged to attend training to look at "program and budget change decisions from a race and social equity perspective." To accomplish this, employees are asked to use a Racial Equity Toolkit.

38. The City's Office for Civil Rights believes that institutionalizing the Racial Equity Toolkit is its "most pressing priority" because it "know[s] that the impacts of racial iniquities cannot be assessed or addressed *without interrupting the color blind ways* departments make decisions." *See* **Exh. 7** (emphasis added). The HSD has been at the forefront of implementing these policies.

39. Mr. Diemert experienced severe discrimination and harassment because of the City and HSD's pervasive focus on race and supposed "white supremacy."

## C. Mr. Diemert Reported Incidents of Discrimination Prior to Filing His EEOC Charge in 2020

40. Mr. Diemert repeatedly reported incidents of discrimination and objected to discriminatory conduct throughout the entirety of his employment with the City.

41. Mr. Diemert reported discrimination he had experienced from Supervisor Inay and others to Mr. Sharkey, which were not redressed.

42. For example, in 2016, Director Gloria Hatcher-Mays (Director Hatcher-Mays) called Mr. Diemert to her office and berated him for attempting to correct co-worker Sabrina Budner's

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

discriminatory behavior towards a white applicant. Director Hatcher-Mays stated that it was impossible to be racist toward "white people." She did not initiate any employment actions against Ms. Budner. Mr. Diemert reported this incident to multiple managers and directors, including his HR representative, but the City took no action. Mr. Diemert also reported this issue in a June 21, 2021, email to Senior Officer Ryan Groce (Senior Officer Groce), Supervisor Chaney Kilpatrick-Goodwill (Supervisor Kilpatrick-Goodwill), and Ron Mirabueno.

43.    On July 13, 2017, Mr. Diemert informed Supervisor Inay of the "divisive and discriminatory" comments he received from a fellow coworker, Fabiola Arvizu. Mr. Diemert also noted "this is not the first time I have dealt with the increased discrimination in the City," and explained that "the lack of concern for this blatant discrimination from past management and a valid fear of retribution" had led him to believe it is better for him to be silent than to disrupt the "city of Seattle status quo."

44.    On November 14, 2018, Mr. Diemert contacted his union representative, Shaun van Eyk (Mr. van Eyk), about the racially hostile work environment he was experiencing and the toll it was taking on his health.

45.    Mr. Diemert met with Mr. van Eyk for two hours on November 27, 2018, and discussed many of his concerns in detail. Mr. van Eyk told Mr. Diemert that he would meet with Felicia Caldwell from the Seattle Department of Human Resources about racially segregated trainings, but Mr. Diemert never received a clear answer to his concerns, which Mr. van Eyk ultimately ignored.

46.    On December 4, 2018, Mr. Diemert received an email from Leslea Bowling, a Planning and Development Specialist from the Human Services Department, inviting him to review a meeting agenda for the white caucus, one of the City's racially segregated groups designed for staff members the City classified as "white." Mr. Diemert responded by telling her to remove him from the email list and noted that he found Ms. Bowling's actions to be racially offensive and that he would file harassment charges with the EEOC if she continued.

47.    In October 2019, Mr. Diemert believed that his team lead, Mr. Said, a City employee, had been misusing the HSD system for personal gain. Mr. Diemert reported the incident to the Mayor's

Complaint - 7
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Office Operations Manager, Rodrigo Sanchez (Mr. Sanchez), who then informed Supervisor Kilpatrick-Goodwill about the incident. Mr. Diemert provided them with evidence, but nothing was done to address Mr. Said's actions. Instead, Mr. Sanchez and Supervisor Kilpatrick-Goodwill told Mr. Diemert to keep quiet and to be silent.

48.     Shortly after Mr. Diemert reported Mr. Said in November 2019, Mr. Said verbally accosted Mr. Diemert, claiming that he was complicit in the sins of slavery, parroting language promoted in the City's RSJI program. Subsequently, Mr. Said would publicly accost Mr. Diemert in the office.

49.     On February 19, 2020, Mr. Said chest bumped Mr. Diemert, got in his face, told him that he had "white privilege," and suggested that Mr. Diemert had racist motives for reporting him. Mr. Said also asserted that Mr. Diemert and his race were to blame for the atrocities in the world, like slavery, segregation, and wealth disparities, and implied that Mr. Said was not responsible for his actions because the "racist" system drove him to commit fraud. Mr. Diemert immediately reported the altercation to the Ethics Department, but the City tookk no action against Mr. Said.

50.     In February 2020, Mr. Diemert met with Director Tanya Kim, where he discussed the unethical and illegal behavior he witnessed during his time at HSD, as well as the City's failure to address incidents when he reported them.

51.     Mr. Diemert reported incidents of discrimination and harassment on several occasions to supervisors, coworkers, and other City employees prior to filing his EEOC charges. The City knew Mr. Diemert was experiencing a racially hostile work environment and did not make any serious effort to redress it.

52.     During employee orientations, the City explains that there are "mandatory reporters," which it defines as "a person or entity that is obligated to immediately report or investigate claims of harassment, discrimination, retaliation, or misconduct." *See* **Exh. 8**. "Management Representatives," including supervisors, managers, leads, crew chiefs, and directors are all identified as "mandatory reporters." ***Id.*** Mr. Diemert alerted supervisors, managers, leads, directors, and fellow coworkers to the discrimination and racial harassment he was experiencing.

Complaint - 8
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Moreover, Mr. Diemert continued reporting the discrimination and harassment he experienced after he filed his EEOC charges.

**D.     Mandatory RSJI Training Created a Racially Hostile Work Environment**

53.     The Department requires that all employees participate in Race and Social Justice Initiative training that aggressively promotes the concept of "white privilege" and the collective guilt that white employees like Mr. Diemert purportedly bear for societal inequality. *See* **Exhs. 9 and 10**.

54.     As a member of the Department, Mr. Diemert's annual reviews included his supervisor's assessments of whether Mr. Diemert completed RSJI activities or events.

55.     As part of his Race and Social Justice Initiative training in 2019, Mr. Diemert attended a two-day "Undoing Institutional Racism" (UIR) workshop. This was hosted by El Centro De La Raza and taught by the People's Institute for Survival and Beyond.

56.     The UIR workshop is rooted in critical race theory, and the facilitators at the event stated that "white people are like the devil," that "racism is in white people's DNA," and that "white people are cannibals."

57.     When Mr. Diemert objected, the facilitators used their platform to belittle and attack Mr. Diemert. Other coworkers that were present continued the mockery in the workplace and made Mr. Diemert the office pariah. Mr. Diemert's coworkers called him a "white supremacist."

58.     Mr. Diemert's supervisor, Supervisor Kilpatrick-Goodwill, told him during one of their meetings in 2020 that coworkers were still talking about his comments from the UIR workshop. Coworkers treated Mr. Diemert differently and would call him "racist" and "hateful."

59.     Mr. Diemert's colleagues used their work emails to berate and entertain violence against him, referring to him as "some asshole," the "reincarnation of the people that shot native Americans from trains, rounded up jews for the camps, hunted down gypsies in Europe and runaway slaves in America," noting that it was not worth addressing his concerns because he would "just come back with more stupidity," and that someone should "get a guy to swing by when Josh is in the restroom and beat him bloody."

60.     Nor was Mr. Diemert able to avoid discriminatory messaging and harassment once his training requirements were completed. Every meeting, activity, and City summit incorporated

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

RSJI training. The diffuse nature of the Race and Social Justice Initiative further ensured that Mr. Diemert had no opportunity for a reprieve from racial harassment.

61.     In addition to the formal training, the City pressured Mr. Diemert into participating in team-specific RSJI training, unit RSJI-created training, department RSJI-created training, City-wide RSJI-created training, and external RSJI-created training.

62.     For Mr. Diemert to receive HSD's "fully performing" rating and to meet expectations, he was required to participate in all assigned RSJI activities. These would include the additional training added to summits, retreats, unit meetings, or other meetings. To receive a rating of "exceeding expectations," Mr. Diemert was required to embrace RSJI principles and encourage others to participate in trainings.

63.     One example of these additional trainings was the February 28, 2020, "Theory of Change" workshop he attended, where he was required to evaluate his Department according to the standards described in a document entitled "Characteristics of White Supremacy Culture." *See* **Exh. 11 and 12**.

64.     The City also strongly encouraged Mr. Diemert to participate in race-based affinity groups, caucuses, and employee resource groups at the unit and department levels despite his repeated objections to the exercises and materials.

65.     For example, Mr. Diemert was invited to attend a discussion on "white racial literacy," which was "open to all people who identify as white in HSD." On another occasion, he received an invitation from Owen Kajfasz, a senior data analyst with the City, to a "White Caucus" meeting, which asked attendees to read an article entitled, "White People Are Cowards."

66.     The City's Office for Civil Rights promotes segregated training for City employees. In June 2020, the Office of Civil Rights emailed Mr. Diemert stating that it was hosting a training on "Internalized Racial Superiority," and that this was "specifically targeted for White employees." The training focused on examining white employees' "complicity in the system of white supremacy," and how white employees "internalize and reinforce" racism. *See* **Exh. 13**. The goal of the training was to turn these employees into white "accomplices" who would interrupt the "whiteness" that they saw in their colleagues.

Complaint - 10
Case No. 2:22-cv-01640

67.     Employees who attempted to attend a training that was not designated for their race would be harassed or reprimanded for their decision.

68.     In 2018, Mr. Diemert asked to sign up for a training reserved only for people of color. Mr. Diemert's union representative, Mr. van Eyk, became very agitated and told Mr. Diemert that he should not sign up. Mr. Diemert later discovered emails that suggested that Mr. van Eyk was not interested in genuinely advocating for Mr. Diemert's concerns.

69.     The City's use of race and social justice training came under scrutiny in 2020. On August 26, 2020, the United States Department of Justice sent a letter to Seattle's City Attorney regarding public reports that the City had conducted "training sessions for its white employees and employees of color in June 2020," potentially in violation of Title VII of the Civil Rights Act. While DOJ did not reach any conclusions in the letter about whether a violation had occurred, it requested additional information from the City.[1]

**E.     Harassment and Coercion to Participate in Race-Based Affinity Groups**

70.     In addition to pressuring employees to attend race-based training, the City of Seattle and HSD created and promoted race-specific "affinity groups" or "caucuses." As one City training material notes, "caucuses are times when people of color and white people within an organization meet separately in order to do our different work."

71.     These groups are focused on "forwarding the City of Seattle's Race and Social Justice Initiative's efforts to eliminate racial disparities and achieve racial equity in Seattle."

72.     The City expected white employees to join the white affinity group and pressured them to accept that white employees and individuals of European origin are all inherently racist, privileged, powerful, and consciously or unconsciously to blame for systemic racism in the workplace and society due to their "white privilege."

73.     White caucus groups are expressly "accountable" to the "change team" and to the "Latinx, African Descent, and Asian and Pacific Islander (API) Caucuses."

---

[1] https://www.documentcloud.org/documents/7203169-Seattle-Notice-Ltr-8-26-20-via-Email.html

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

74.     In these caucuses Mr. Diemert was encouraged to "work through guilt" that he should bear due to his race.

75.     Mr. Diemert consistently opposed invitations to join the City of Seattle's "white caucus." Despite expressing his discomfort and communicating how these types of communications and programs were taking a toll on his health, and that he did not want to receive further communications from the City's white caucus, he continued to receive communications from the group.

76.     City staff never encouraged or told Mr. Diemert that he was allowed to attend any other affinity groups other than the "white caucus," and based on how coworkers were treated if they attempted to attend training for the wrong "race," Mr. Diemert knew that any attempt to attend other affinity groups would result in a reprimand or further harassment.

77.     On June 21, 2021, Mr. Diemert sent Senior Officer Groce an email where he explained that he felt that "all of the Race & Social Justice training (RSJ), including the affinity caucuses, are blatantly racist, stereotype people based on superficial characteristics and apply negative attributes to entire groups of people based off the color of their skin." Mr. Diemert expressed his concern about "constantly being bombarded with racially denigrating material on the City of Seattle intranet, splash pages, incoming emails and in material dispersed around the workplace" so that he was not allowed to "just do the work" he was hired to do. In 2021, Mr. Diemert proposed the creation of a non-race-based affinity group that opposes stereotypes. He was told by Senior Officer Groce that he was not authorized to begin work on it and that it would need to support the City's commitment to workforce equity based on the principles of the City's RSJI.

78.     In a subsequent email, the HR Director described how Mr. Diemert "requested to start an affinity group that opposes Change Team Values," and that he was told that he "wasn't authorized to move forward based on City business needs." Mr. Diemert also learned that rather than addressing his criticisms of RSJI, Senior Officer Groce apologized to his immediate supervisors for "the potentially harmful things" Mr. Diemert had stated in the email and forwarded his email to Nikki Dias (Ms. Dias), a union representative and political organizer, who suggested that Mr. Diemert was taking "a position that could result in insubordination."

Complaint - 12
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**F.     Mr. Diemert Experienced Severe and Recurring Stereotyping and Harassment**
**Based on His Race**

79.     City-approved workshops and affinity groups not only promulgated racist RSJI ideology, but employees in director and supervisory roles over Mr. Diemert also frequently reiterated these same principles. For example, in a 2016 unit meeting, Jason Johnson (Mr. Johnson), former division director, told staff that "all white people" have "white privilege" and are "racist." He also noted that it was impossible for black people to be racist, and that white people can never experience racism.

80.     On another occasion in 2020, Supervisor Kilpatrick-Goodwill, Mr. Diemert's supervisor and supervisor of HSD's utility-assistance programs, told Mr. Diemert that it is impossible for one to be racist towards "white people," that all "white people" are racist, and that "black people" cannot be racist, thereby echoing the same racially hostile messaging disseminated in RSJI training and related workshops.

81.     Throughout the entirety of his employment, Mr. Diemert also attended meetings where supervisors forced their employees to identify their race and to stand and affirm where they ranked themselves on a defined "continuum of racism." He felt pressured into conforming to some of these exercises for fear of retaliation and hostility from his supervisors and coworkers.

82.     The City also disseminated and encouraged racist messaging in emails, lunchroom conversations, meetings, and training. City meetings and summits often started with a proclamation that the land upon which they all stood was stolen by "white people," who are blamed for legacies of genocide, enslavement, exploitation, displacement, and all other forms of structural violence.

83.     These attitudes are also present when City employees interact with one another in training and other work contexts. It was commonplace for Mr. Diemert to hear statements like: "HSD is still a white institution," and that "white people" have to give up "power, priorities, and privilege."

84.     Mr. Diemert experienced numerous severe and pervasive incidents of harassment that altered the conditions of his employment and created an abusive working environment.

Complaint - 13
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

85.     In 2017, for example, Mr. Diemert's co-worker, Consuelo Crow (Ms. Crow), began a discussion in the lunchroom in which she stated that "white people" are to be blamed for "all atrocities" and that the United States was built upon a system of "white supremacy." She told Mr. Diemert that he was "privileged" and labeled him a "racist" because he favored capitalism. Ms. Crow also said that his words were "violence" and that he was invading her "safe space."

86.     This type of discrimination and harassment was regular and routine, often occurring several times a week, and was encouraged by the RSJI framework, programming, and training.

87.     In 2020, while Mr. Diemert was attempting to cook his food, a group of co-workers was sitting at one of the few lunchroom tables, openly talking about "white privilege." The group consisted of Supervisor Kilpatrick-Goodwill, a supervisor from Seattle City Light, Monica Jones, and other co-workers. Mr. Diemert joined their conversation. Members of the group told Mr. Diemert that his response was invalid because he was "white" and "did not have a right to speak about black oppression" and that Mr. Diemert was attempting to discredit their lived experiences with his "white privilege." They also proceeded to make general disparaging comments about "white people."

88.     In June 2021, Race and Social Justice Lead/Chief Equity Officer Edward Odom shared an article regarding Critical Race Theory (CRT) and laws attempting to ban the teaching of it, drawing specific attention towards the 1921 Tulsa Race Massacre. Mr. Diemert commented on the post that Mr. Odom shared. Mr. Odom responded to Mr. Diemert's comment by saying that white people like him should feel guilty for atrocities like the Tulsa Race Massacre. Mr. Odom then sent Mr. Diemert an aggressive and condescending email further attacking him for his comments.

89.     Mr. Odom shared his criticism of Mr. Diemert with many other senior staff members in the IT Department and elsewhere who disparaged Mr. Diemert in both public and private.

90.     Moreover, City documents further reveal that the City was not concerned about Mr. Diemert's well-being, but it was instead actively investigating Mr. Diemert for no apparent reason, going so far as to assemble a "confidential file" on him.

///

Complaint - 14
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

**G.    The City's Discriminatory Conduct Negatively Impacted Mr. Diemert's Health**

91.    The hostile work environment created by the City took a heavy toll on Mr. Diemert's health, to the point that his doctor noted in a December 5, 2018, letter that "a major source of stress for him … are his cultural sensitivity training classes. These events are causing significant effects on him and are severely detrimental to his health. For the next few months, he needs to be excused from attending these classes." Mr. Diemert submitted medical documentation to the City to demonstrate the impact his hostile work environment was having on his health, but HSD never honored his doctor's request to have him excused from RSJI-type training.

**H.    Blatant Acts of Discrimination Against White Job Applicants and Benefit Seekers Are Encouraged and Ignored**

92.    Between the years of 2015 and 2017, Mr. Diemert regularly participated in interview panels to screen prospective City employees. He was told by Director Hatcher-Mays that he should specifically focus on hiring "black female refugees that speak Farsi."

93.    On multiple occasions, upper-level managers told Mr. Diemert and other Department employees that when new jobs become available, particularly in senior roles, they were looking to fill those positions with people of color and that white men should not apply. Acting Director of HSD, Tanya Kim (Acting Director Kim), and former director Mr. Johnson would both encourage City employees to push job openings toward "BIPOC" (Black, Indigenous, and People of Color) communities.

94.    Mr. Diemert also witnessed HSD's data gathering in 2018 systematically exclude white people. The Department teamed up with the University of Washington to complete a study to assess racial and ethnic subgroups that were underserved. Mr. Diemert noticed that his Department only wanted to break down race and ethnic subgroups for non-white groups. When he asked why they were not considering doing this for white individuals as well, Department staff told him that white people are "privileged" and that there was no reason to subgroup them. Mr. Diemert explained that they had many clients that were extremely poor and would benefit if they were not just stereotyped as white. His department told him that this was not needed because they benefitted by living in a system of "white supremacy."

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

95.     In 2016, Mr. Diemert learned from his subordinates that they had been denying eligible white applicants program benefits they were eligible to receive solely because of their race.

96.      Mr. Diemert audited some of the cases and found that his co-worker, Ms. Budner, had denied an eligible white applicant for an assistance program. When Mr. Diemert questioned her about this, she stated that the eligible person was denied because he had "white privilege."

97.     Mr. Diemert told Ms. Budner that she was not permitted to process applications in a discriminatory manner. The City took no action against this blatant act of discrimination.

98.     After the start of the pandemic, and throughout 2020 and 2021, Department leadership and co-workers openly discussed the need to carry out layoffs based on race during Department all-staff video meetings. Mr. Diemert felt denigrated and humiliated, as he had to attend these meetings and listen to Department staff and other City leaders brainstorming how they could lay off white workers, and how this could be done using the Racial Equity Toolkit or the Race and Social Justice Initiative. They discussed how BIPOC employees would be negatively affected under a seniority system, and methods to give BIPOC more "time" so that they could effectively "bump" white employees who had seniority. These types of discussions also occurred in other departments.

**I.      The City Denied Mr. Diemert Opportunities to Advance Within His Office Because of His Race**

99.     Mr. Johnson, the former division director for homelessness, promised Mr. Diemert that he would eventually see a title change and corresponding pay upgrade, and for Mr. Diemert to not be concerned about working outside of his department.

100.    Relying on Mr. Johnson's communication, Mr. Diemert assumed work responsibilities that exceeded the scope of his job title and worked with employees across several City departments. However, despite Mr. Diemert having a positive employment record, receiving an award for his good work, and consistently complying with City policies and procedures, he never received a permanent promotion nor a substantial pay increase during his over eight years as a City employee.

101.    His lack of promotion was a result of his race and his willingness to question the City's Race and Social Justice Initiative.

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

102.     One specific example of the City denying Mr. Diemert a promotion and recognition that was due to him on account of his race pertains to his work on the "Vehicle License Fee Rebate Program" that occurred sometime in 2015. Former Director Hatcher-Mays had not done the proper hiring or preparation for the program launch. Mr. Diemert worked overtime to help her launch the program and run it. He developed the internal policies for the program. It was supposed to have been staffed with a supervisor, two line workers, an outreach coordinator, and two administrative staff members. Mr. Diemert ended up doing the work for all these positions, and he worked alongside other departments to make the program work.

103.     Former Director Hatcher-Mays told the other departments that Mr. Diemert was the supervisor even though he received neither the title nor the corresponding pay increase. As a result of doing the work of six positions, Mr. Diemert was delayed in completing a certain task for the program. This resulted in someone making a complaint to the Customer Service Bureau.

104.     After this incident, Director Hatcher-Mays hired Iris Guzman, a person of color, as a supervisor and had Mr. Diemert train her. Even after hiring Ms. Guzman, Director Hatcher-Mays directed Mr. Diemert to continue running the program because Ms. Guzman had no supervising experience.

105.     Ms. Guzman was chosen over Mr. Diemert for the position because of her race.

106.     Despite Ms. Guzman's lack of experience and involvement in the project, she still received the pay and title, even though Mr. Diemert continued to perform substantial work. As a result of these conditions, Mr. Diemert eventually communicated that he would no longer do anything in support of the program. Shortly after this decision, he was ordered by department director Tiffany Washington to continue in the role, and he was required to work overtime.

**J.      The Department Required Mr. Diemert to Work Under Mr. Said Despite Mr. Diemert Reporting Mr. Said for Misconduct, and Experiencing Racial Harassment and Discrimination from Him**

107.     Despite Mr. Said racially harassing Mr. Diemert on several occasions, the City did not offer any solution apart from suggesting Mr. Diemert move away from his preferred workstation. But when Mr. Diemert complained that it would be unfair to punish him for reporting discrimination,

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Mr. Said was ultimately moved just a few feet away from Mr. Diemert's workstation. The City's investigation into Mr. Said's discriminatory behavior was inadequate and did not include any interviews with any of the employees that had been witnesses.

108.    In its report to the EEOC, the City claimed that Mr. Said was no longer Mr. Diemert's supervisor and no longer worked in that office. But this was not true. Following Mr. Said's harassing behavior toward Mr. Diemert, Mr. Said continued to supervise Mr. Diemert directly and evaluate his work product. As a Lead Program Intake Representative (PIR), Mr. Said was in a position of authority and control over Mr. Diemert. Lead PIRs review the work of non-lead PIRs like Mr. Diemert regarding approval into the Utility Discount Program. Supervisor Kilpatrick-Goodwill required Mr. Diemert to include Mr. Said in his emails and report his absences to Mr. Said. Following Mr. Diemert's allegations, Mr. Said's role overseeing Mr. Diemert's work did not change.

109.    In April 2020, Marc Mayo, an Ethics and Whistleblower Advisor, Trainer, and Investigator for the City of Seattle Ethics and Elections Commission contacted Mr. Diemert and informed him of the results of the investigation. He told Mr. Diemert that the investigation had determined that while line workers were not allowed to work on cases regarding family members, the rules technically did not apply to those in leadership positions. Mr. Mayo claimed that Mr. Said was exempt from ethical requirements regarding self-dealing because he was in a leadership role.

110.    Department management allowed Mr. Said's hostility and discriminatory conduct towards Mr. Diemert to continue. Mr. Said continued to be Mr. Diemert's lead, resulting in Mr. Diemert having to report to the very individual he had turned in for misconduct.

111.    Mr. Said was not reprimanded for physically threatening Mr. Diemert or for the racist remarks he made toward Mr. Diemert.

112.    Mr. Diemert was disturbed and distressed about the City's inaction against Mr. Said. He decided to go public with his allegations against Mr. Said. On August 31, 2021, Mr. Diemert tried to send an email to his colleagues at the Department, outlining Mr. Said's improprieties and highlighting the City's total inaction. The email to the Department bounced because the City had

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(425) 576-0484

been monitoring and limiting Mr. Diemert's email privileges in light of his complaints about RSJI. He subsequently sent the email to his unit, which successfully went through.

113.    The Ethics Department eventually found that Mr. Diemert's allegations had merit and that Mr. Said's actions were unethical and a violation of City rules.[2]

114.    An administrator in Mr. Diemert's unit, John Fields, Jr., quit over what he saw as the City's prior sham investigation. The City then again attempted to defend and protect Mr. Said from any accountability by requesting administrative dismissal of the complaint against Mr. Said from the Seattle Ethics and Elections Commission because it claimed the offense was "minor." At its April 6, 2022, meeting, the Commission rejected the request for administrative dismissal and commissioners expressed their discomfort with the effort to dismiss a claim of self-dealing as a "minor" violation.[3]

115.    The City's protection and discriminatory preference for Mr. Said traces back to its Race and Social Justice Initiative.

**K.      The City Placed a RSJI Change Team Member in Charge of the Investigation of Mr. Diemert's Claims of a Hostile Work Environment**

116.    Mr. Diemert filed his first complaint with the EEOC on December 23, 2020, which was amended in January 2021. The filing of that complaint triggered an internal investigation by the City's Department of Human Resources (SDHR).

117.    The SDHR investigation did not constitute a serious effort from the City to investigate Mr. Diemert's claims. The lead investigator assigned to his case, Brandon Kuykendall (Mr. Kuykendall), was an active volunteer and member of a Change Team, one of the many entities specifically tasked with infusing RSJI principles into all City operations. Mr. Diemert felt that this created an unavoidable conflict of interest. As Mr. Diemert explained in an email to Mr. Kuykendall and the head of SDHR, "that means you have someone who is part of my complaint investigating himself while simultaneously involved in the overt racism and discrimination my complaint details." But SDHR refused to appoint a different investigator.

---

[2] http://www.seattlechannel.org/ethics?videoid=x136993 at 12:55–31:15
[3] *Id.*

Complaint - 19
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

118.    Mr. Kuykendall conducted a haphazard investigation and wrote a report that exonerated the Change Team. Mr. Kuykendall wrote the first draft of his report finding no fault even before he completed his investigation and without thoroughly investigating Mr. Diemert's claims. Mr. Kuykendall did not interview key witnesses or take the necessary steps to engage in a thorough investigation. Mr. Kuykendall approached Mr. Diemert's claims with skepticism and hostility.

119.    On August 27, 2021, Mr. Diemert received the final report from Mr. Kuykendall. The incomplete investigation and the inaccurate and one-sided nature of the report once again showed Mr. Diemert that there was no chance that the Department or the City would abandon its relentless RSJI push. To Defendants, Mr. Diemert was merely a member of a disfavored racial group.

**L.    The City's Treatment of Mr. Diemert Grew Worse After He Filed His EEOC Complaint**

120.    Mr. Diemert was subject to increasingly adverse treatment after he submitted his EEOC complaint and continued to raise his concerns about the RSJI program in the workplace.

121.    In January 2021, Supervisor Kilpatrick-Goodwill retaliated against Mr. Diemert because he had filed his EEOC charge on December 23, 2020, and because he had voiced his objections to the City's RSJI on numerous occasions. In response to Mr. Diemert inquiring about why the inbox for public emails was not being checked and the length of time it was taking for emailed applications to be assigned to staff, Ms. Kilpatrick sent out an email asking, "how many applications does Josh have sitting in the drawer … what is the oldest date of his applications and delays?" She did not question other employees about the same issue, despite other employees having delayed applications.

122.    Mr. Diemert's co-workers confirmed Supervisor Kilpatrick-Goodwill's retaliatory targeting of Mr. Diemert.

123.    Mr. Diemert normally met with Supervisor Kilpatrick-Goodwill, his direct supervisor, monthly. In February or March 2020, Mr. Diemert had his usual monthly meeting with Supervisor Kilpatrick-Goodwill and raised his concerns about the racialized training and RSJI material. After that, their monthly meetings became increasingly infrequent. For most of 2021, nearly all of Mr. Diemert's monthly meetings with Supervisor Kilpatrick-Goodwill were canceled even though his

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

other colleagues were having their regular meetings. By August 2021, he had not had a monthly meeting in months and was not receiving any support for his work. For instance, when Mr. Diemert suffered severe tech problems, he received no support from Supervisor Kilpatrick-Goodwill and had to reach out to upper management to get that assistance. He had to spend months getting approval to use the Adobe PDF software even though it was crucial for his day-to-day work.

124.    Mr. Diemert also experienced issues with an FMLA request in 2021. In July 2021, the Department of Labor found that the City violated Mr. Diemert's FMLA rights by denying him a reduced work schedule and leave for biannual medical treatment. The DOL report also noted that "Tina Ng-Rudell in Human Resources had caused roadblocks in the employee's ability to be approved for FMLA leave" by giving Mr. Diemert incorrect instructions on how to correct the medical certification submitted on May 5, 2021. The report further noted that the City "did not provide an explanation for why the violations occurred."

125.    Mr. Diemert was denied FMLA leave on account of his race and in retaliation for his criticism of the RSJI initiative.

126.    Throughout 2021, Mr. Diemert continued to tell his supervisors and others that his health was suffering because of the racial harassment that he experienced.

127.    One of the few things that helped Mr. Diemert continue to carry out his duties despite his concerns was the ability to work from home following the onset of the COVID-19 pandemic. He also felt that being able to work from home was a health necessity given that he was in a high-risk category. But in August 2021, he was informed that due to staffing shortages, the City could no longer accommodate his request to work from home. He came to understand that the decision of whether he would be allowed to work from home would be made using the "equity toolkit" and that "BIPOC" applicants would be given priority to telework over him based on their race. He expressed his concern that "I believe it is becoming quite clear that the disregard for my high risk status is solely because of the color of my skin" and that he felt "like the actions by the City of Seattle are purposeful to ensure I have no other choice but be compelled to quit a job I put my heart and soul into."

Complaint - 21
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

128.    As a result of the racial discrimination and the hostile work environment Mr. Diemert experienced, he felt compelled to resign from his position rather than continue to be subjected to continued abuse. As he told Mr. Mayo just a few days before he resigned, "Ever since I reported Shamsu to Ethics and filed a charge with the EEOC I have felt like I am being pressured to quit ... the workplace is not conducive to my health, I feel like I am constantly ... on defense from being attacked or discriminated against because the environment is toxic and hostile ..."

## CLAIMS FOR RELIEF

### COUNT I

### (Equal Protection)

129.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 128.

130.    "Classifications based on race carry a danger of stigmatic harm," and can "promote notions of racial inferiority and lead to a politics of racial hostility." *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989).

131.    Public employees are entitled under the Equal Protection Clause to be "free of purposeful workplace harassment on the basis of protected status." *Rodriguez v. Maricopa Cty. Cmty. Coll. Dist.*, 605 F.3d 703, 707 (9th Cir. 2010).

132.    Racial classifications that are motivated by "prejudice or stereotype"—even when narrowly tailored—violate the Equal Protection Clause of the Fourteenth Amendment. *Croson*, 488 U.S. at 493.

133.    Defendants treated Plaintiff differently from his colleagues because of his race when they intentionally segregated staff meetings by race, offered and required race-based programming, promoted affinity groups, and maintained a commitment to making racial distinctions among City staff.

134.    Defendants treated Plaintiff differently on account of his race throughout the entirety of his employment with the City.

135.    Defendants' discriminatory actions towards Plaintiff do not serve a compelling interest, nor are they narrowly tailored.

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

136.    Defendants' discriminatory actions violated the Equal Protection Clause of the Fourteenth Amendment.

## COUNT II

### (Hostile Work Environment - Violation of Title VII)

137.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 136.

138.    Defendants have subjected Plaintiff to severe, pervasive, and objectively offensive racial harassment through mandatory race-based training, segregated staff meetings, encouraging race-based affinity groups, and frequent and repeated affirmations by Defendants about the City's commitment to making racial distinctions among City staff through the RSJI.

139.    The harassment Mr. Diemert experienced at the hands of the Defendants was motivated by his race.

140.    Mr. Diemert repeatedly expressed his objections not only towards RSJI training, affinity groups, and other racial distinctions made by the City, but also objected to the harassment he experienced from coworkers, thereby clearly communicating that the harassment was unwelcome.

141.    The harassment deprived Mr. Diemert of access to adequate professional development, altered the conditions of his employment, and had a systemic effect on the work environment within the City as a whole.

142.    During the entirety of Mr. Diemert's employment with the City, he was subjected to race-based messaging and humiliation.

143.    Mr. Diemert had no recourse for resolving the conditions of his hostile work environment.

144.    The harassment created an objectively hostile and abusive work environment, which a reasonable person would find hostile or abusive.

145.    Mr. Diemert experienced a tremendous amount of stress over the hostile work environment created by the City of Seattle, requiring him not only to take time off from work and to seek counseling but ultimately forcing him to leave his employment with the City of Seattle altogether.

146.    Mr. Diemert's career stagnation and lack of promotion because of his race and willingness to object to the race and social justice initiative caused him extreme mental distress.

Pacific Legal Foundation
255 South King Street, Suite 800
Seattle, Washington 98104
(425) 576-0484

147.     Defendants knew of the harassment and were deliberately indifferent to it.

148.     The harassment that Mr. Diemert experienced was a direct and foreseeable consequence of the policies and practices adopted by Defendants.

149.     The deliberate indifference of the Defendants to the racially hostile environment violated Title VII of the Civil Rights Act.

## COUNT IV

### (Retaliation - Violation of Title VII)

150.     Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 149.

151.     Title VII, 42 U.S.C. § 2000e-3, provides that "it shall be unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter."

152.     At all relevant times hereto, Title VII, 42 U.S.C. § 2000e was in full force and effect and was binding on Defendants.

153.     Said statute required Defendants, and their employees and agents, to refrain from retaliating against any employee because of their race.

154.     Mr. Diemert engaged in protected activity when he complained about discrimination and harassment based on race.

155.     In retaliation for Mr. Diemert's complaints, the City subjected Mr. Diemert to increased hostile behavior designed to force him to quit and ultimately leading to his constructive discharge, including, but not limited to, his direct supervisor canceling nearly all of his monthly meetings and ceasing to support him in his work, as well as HR refusing to process Mr. Diemert's FMLA paperwork, attempting to make him do things that were beyond the scope of the law, and were explicitly discriminatory towards him until he reported them to the Department of Labor. The DOL subsequently charged the City with 11 violations and forced them to process his FMLA request.

156.     Mr. Diemert had to constantly be on defense, as his work environment became increasingly toxic and hostile. He was forced to continue looking at degrading and racist material disseminated in the office that labeled him a white supremacist. The effect of the practices complained about in

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

Paragraphs 1 through 128 has been to deprive Mr. Diemert of equal employment opportunities and otherwise adversely affected his status as an employee because of his race.

157.    There was a causal connection between Mr. Diemert's discrimination complaints and the materially adverse actions taken against him by Defendants.

158.    The retaliation endured by Mr. Diemert would dissuade a reasonable employee from making complaints of discrimination and harassment.

159.    Defendants retaliated against Mr. Diemert for engaging in protected activity in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

**COUNT IV**

**(Constructive Discharge)**

160.    Plaintiff hereby realleges and incorporates by reference the allegations contained in Paragraphs 1 through 159.

161.    Mr. Diemert suffered an adverse action based upon retaliation.

162.    After Mr. Diemert engaged in activity protected under Title VII, the Defendants' retaliatory actions included, but were not limited to, a calculated pattern of harassment and intimidation, as noted in Paragraphs 22 through 128.

163.    There is a causal connection between Mr. Diemert's filing of his EEOC Complaint and all subsequent adverse employment actions taken against him by the Defendants and leading to his constructive discharge.

164.    The Defendants forced Mr. Diemert to terminate his employment based upon retaliatory motive, in violation of Title VII.

165.    Defendants made Mr. Diemert's working conditions so intolerable that a reasonable person in his position would feel compelled to retire. Mr. Diemert asserts this as a separate actionable claim.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, the Plaintiff prays for relief as follows:

Complaint - 25
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

1.      For a declaration that the City of Seattle's acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by the Equal Protection Clause of the Fourteenth Amendment and Title VII of the Civil Rights Act;

2.      Retain jurisdiction over this action to assure full compliance with the orders of the Court and with applicable law and require Defendants to file such reports as the Court deems necessary to evaluate compliance;

3.      Enter an order for compensatory and punitive damages in the amount of $300,000.00 for the salary that Mr. Diemert was denied as a result of being discriminatorily denied promotions and constructively discharged as well as for his mental pain and suffering, and for the Defendants' blatant and unrepentant violations of Mr. Diemert's civil rights;

4.      Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

5.      For nominal damages and such other relief as the Court deems just and proper.

///

Complaint - 26
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*

DATED:  November 16, 2022.

Respectfully submitted:

PACIFIC LEGAL FOUNDATION

*s/  Brian T. Hodges*
BRIAN T. HODGES, WSBA # 31976
255 South King Street, Suite 800
Seattle, Washington 98104
Telephone: (425) 576-0484
BHodges@pacificlegal.org

LAURA M. D'AGOSTINO
Virginia Bar # 91556 *
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
LD'Agostino@pacificlegal.org

ANDREW R. QUINIO
California Bar # 288101 *
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
AQuinio@pacificlegal.org

* Pro hac vice applications forthcoming

*Counsel for Plaintiffs*

Complaint - 27
Case No. 2:22-cv-01640

*Pacific Legal Foundation*
*255 South King Street, Suite 800*
*Seattle, Washington 98104*
*(425) 576-0484*