Hon. Lauren King

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| JOSHUA A. DIEMERT, an individual, | ) | Civil Action No. 2:22-cv-01640-LK |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION TO** |
| THE CITY OF SEATTLE, a Municipal | ) | **DISMISS PURSUANT TO RULE 12(b)** |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | **Noted on motion calendar April 7, 2023** |
| | ) | |
| | ) | **ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................................ 2

   A.   The Race and Social Justice Initiative is Official City Policy that Requires Employees to Use Race throughout their Employment ........................................................ 2

   B.   Mr. Diemert Experienced Repeated Racial Harassment and the City was Indifferent to His Complaints ........................................................................................... 3

   C.   Mr. Diemert Faced Retaliatory Actions After Reporting ........................................ 3

   D.   All of Mr. Diemert's Allegations are Relevant and Timely Filed ........................... 4

P. Oppo. to Mot. to Dismiss - i
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

E.    Mr. Diemert Properly Filed His Tort Claim Form Prior to Bringing His State
      Law Claims........................................................................................................ 7

III.   STATEMENT OF ISSUES ...................................................................................... 7

IV.   ARGUMENT ............................................................................................................ 8

A.    Standard of Review .......................................................................................... 8

B.    Mr. Diemert has Alleged a Plausible Hostile Work Environment Claim ........................ 8

C.    Mr. Diemert Has Alleged a Plausible Disparate Treatment Claim ................................. 12

D.    Plaintiff has Sufficiently Pled That He Was Constructively Discharged......................... 14

E.    Plaintiff has Pled a Plausible Retaliation Claim............................................................. 14

F.    Mr. Diemert Has Plausibly Alleged a Violation of the Equal Protection Clause ........... 17

G.    Mr. Diemert Submitted a Tort Claim Form ................................................................... 20

CONCLUSION............................................................................................................................ 20

LOCAL CIVIL RULE 10 CERTIFICATION.............................................................................. 20

CERTIFICATE OF SERVICE ..................................................................................................... 22

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

## I.    INTRODUCTION

The City moves under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint of its own invention—not the one before this Court. The City's motion[1] disregards Mr. Diemert's detailed allegations, misconstrues the claims of his First Amended Complaint (FAC, Dkt. 11), and fails in its attempt to justify the racial harassment and discrimination it inflicted upon him. The FAC extensively details each of Mr. Diemert's claims, leaving no doubt that if he proves those well-pled allegations, the City is liable for violating his rights. Put simply, the City has failed to demonstrate "beyond doubt" that Mr. Diemert can prove "no set of facts entitling him to relief." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011).

The City offers three bases on which to dismiss the complaint, but none are convincing. *First*, Mr. Diemert has stated plausible equal protection, Title VII, and Washington Law Against Discrimination (WLAD) claims. He has pled severe racial harassment and retaliation (FAC ¶¶ 3–6, 28, 32–36, 45, 48–54, 57–58, 63–69, 70–77, 85, 88, 90–98, 120–125, 129–143, 152–165, 174–184) that compromised his work environment and his health (FAC ¶¶ 3–6, 55, 70–74, 86, 92, 103). *Second*, whether the Race and Social Justice Initiative (RSJI) is narrowly tailored to achieve a compelling purpose is plainly premature on a motion to dismiss, but, in any event, the City cannot meet its immense burden under strict scrutiny. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). *Third*, Mr. Diemert filed a tort claim form and gave 60 days' notice before bringing his claims. *See* Exh. 6 of FAC (Dkt. 11-6) (showing that the City received Mr. Diemert's form on November 14, 2022). Mr. Diemert received a letter from the City on January 19, 2023, indicating that it had received notice of his claim. *See* **Exh. 1**.[2]

---

[1] Mr. Diemert responds to Defendant's Corrected Motion to Dismiss (MTD) attached to Defendant's Praecipe at Dkt. 19. Although Defendant has improperly attached exhibits to its motion, each exhibit further corroborates Mr. Diemert's claims.

[2] Mr. Diemert requests that this Court take judicial notice of the City having received his tort claim form pursuant to Fed. R. Evid. 201. In any event, in light of this letter, it is obviously incorrect for the City to assert that there is no possible evidence supporting Mr. Diemert's contention that he filed a tort claim notice.

P. Oppo. to Mot. to Dismiss - 1
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

If Mr. Diemert can prove the allegations set forth in the First Amended Complaint—as this Court must assume on a motion to dismiss—he will prevail on his claims. Accordingly, this Court should deny the City's motion.

## II.     STATEMENT OF FACTS

### A.  The Race and Social Justice Initiative Is Official City Policy that Requires Employees to Use Race Throughout Their Employment

The City concedes that the RSJI is its longstanding practice and standard operating procedure. *See* MTD, Dkt. 19-1 at 5 ("The Race and Social Justice Initiative is the City's commitment…."); ("This work is critical to the City, including Plaintiff's former department, the HSD."); at 6 ("The RSJI training are for all employees…."); at 7 ("Another component of the RSJI is the Race Equity Toolkit…."). Further, it is indisputable that RSJI directs employees to lead with race, "center People of Color," "de-center whiteness," and that all white employees should work at undoing their "whiteness" and "prioritize the leadership of Black, Indigenous, and People of Color…." FAC ¶ 41.

Since 2005, all City departments have developed and implemented annual RSJI work plans. City employees are encouraged to attend training to examine "program and budget change decisions from a race and social equity perspective." FAC ¶ 43. Employees use the Racial Equity Toolkit to accomplish this objective. FAC ¶ 43. The City's Office for Civil Rights proclaims that institutionalizing the Racial Equity Toolkit is its "most pressing priority," and the City instructs its employees that "colorblindness" is a form of white supremacy. FAC ¶ 44. The Racial Equity Toolkit guides application of RSJI policy and instructs employees to see each other through a racial lens. When combined with the discriminatory training and mandates of the RSJI, the application of the Racial Equity Toolkit fomented an environment that led to the discriminatory practices that severely impacted Mr. Diemert.

RSJI applies to all employees, but it applies differently to employees depending on their racial identity. RSJI forces employees to make assumptions about fellow employees because of their race. *See* FAC ¶ 42 ("RSJI divides people into two main categories, white and 'Black,

P. Oppo. to Mot. to Dismiss - 2
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Indigenous and People of Color' (BIPOC), or 'oppressor' and 'oppressed.' City training promotes 'BIPOC Affinity Spaces' and encourages the exclusion of 'white folks….'"). Accordingly, Mr. Diemert was treated significantly worse than his BIPOC-identifying colleagues consistent with City policy. He was regularly told that he could never experience racism because he possessed "privilege," and that he was "consciously or unconsciously" to blame for systemic racism solely because of his race. *See* FAC ¶¶ 4, 49, 70, 83, 90–91. The City's RSJI resulted in an environment where directors were encouraged and did use race in employment decisions (FAC ¶ 104), the City denied access to services to white applicants (FAC ¶ 49), racially segregated training and staff meetings (FAC ¶¶ 77, 79, 92), allowed Mr. Diemert to be physically accosted while being subjected to racially derogatory comments without the offending employee facing any recourse (FAC ¶¶ 57–58, 120–128), and one in which the City made no serious attempts to investigate Mr. Diemert's complaints of discrimination (FAC ¶¶ 34, 53, 130–132).

### B. Mr. Diemert Experienced Repeated Racial Harassment and the City Was Indifferent to His Complaints

Mr. Diemert experienced severe racial harassment and discrimination as a City employee. From being denied opportunities for advancement based on his racial and ethnic identity (FAC ¶¶ 32–37), to being threatened by a supervisor and forced to report to this same supervisor (FAC ¶¶ 57–58, 120–128), and to being verbally assaulted in a racially discriminatory manner (FAC ¶¶ 33, 48–49, 51, 58, 66, 96), the racial harassment and discrimination was seemingly limitless. The City was aware of the ongoing discrimination Mr. Diemert was experiencing and the impact it was having on his health (FAC ¶¶ 52, 55, 86, 103).

### C. Mr. Diemert Faced Retaliatory Actions After Reporting

Throughout his employment, Mr. Diemert repeatedly informed his supervisors, union representatives, and managers of the discrimination he personally experienced and the practices he observed that he reasonably concluded violated Title VII. *See* FAC ¶¶ 47–55, 60. In retaliation, the City refused to excuse Mr. Diemert from RSJI-type training (FAC ¶ 103), denied

P. Oppo. to Mot. to Dismiss - 3
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

him backpay for out-of-class work (FAC ¶ 119), covertly surveilled him by creating a "secret" or "confidential" file (FAC ¶ 102), and required him to continue working under a supervisor that he had reported for misconduct, racial harassment, and discrimination (FAC ¶¶ 120–121).

The retaliation expanded after Mr. Diemert filed his initial EEOC charge and continued to raise concerns about the discriminatory behavior he was experiencing. This included being forced to continue reporting to Mr. Said (FAC ¶¶ 120–121), his direct supervisor, canceling nearly all of his monthly meetings and ceasing to support him in his work (FAC ¶¶ 136, 179), undue scrutiny from Supervisor Kilpatrick-Goodwill (FAC ¶¶ 133–134), the City conducting an incomplete and biased internal investigation into Mr. Diemert's claims of discrimination (FAC ¶¶ 129–132), as well as HR refusing to process Mr. Diemert's FMLA paperwork (FAC ¶ 137). The Department of Labor found that the City had violated Mr. Diemert's FMLA rights and that "Tina Ng-Rudell in Human Services had caused roadblocks in the employee's ability to be approved for FMLA leave" and that the City "did not provide an explanation for why the violations occurred." FAC ¶ 137. Mr. Diemert informed the City of the impact this retaliation was having on his work and health when he told Mr. Mayo, "ever since I reported Shamsu to Ethics and filed a charge with the EEOC I have felt like I am being pressured to quit…the workplace is not conducive to my health, I feel like I am constantly…on defense from being attacked or discriminated against because the environment is toxic and hostile." FAC ¶ 143.

**D. All of Mr. Diemert's Allegations Are Relevant and Timely Filed**

On December 23, 2020, Mr. Diemert filed a charge of retaliation and discrimination with the EEOC. FAC ¶ 15.[3] On January 16, 2021, Mr. Diemert filed an amended charge of retaliation and discrimination. FAC ¶ 16. On June 30, 2022, Mr. Diemert filed an additional charge with the EEOC, detailing additional, continuing acts of discrimination he experienced between December 23, 2020, and September 7, 2021. FAC ¶ 17. Mr. Diemert timely filed his EEOC charges relative to his allegations. Acts that occurred in 2020 and 2021 include:

---

[3] Mr. Diemert will testify that he had attempted to file his EEOC charge earlier in 2020, but due to the pandemic and communicated instructions from an EEOC representative, Mr. Diemert was not permitted to submit his charge until December 23, 2020.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

1. Regular occurrence of disparaging anti-white comments made by supervisors, mangers, trainers, and coworkers in communications, meetings, and trainings, and distinctions made by supervisors among employees based solely on their racial identity. *See* FAC ¶¶ 38–45, 62, 69–71, 74–75, 77, 80–87, 90–95, 97–101, 110.

2. Throughout 2020 and 2021, Department leadership and coworkers openly discussed using race as a determining factor in lay-off decisions and how they could use the Race Equity Toolkit and the RSJI to accomplish this, even if it meant violating the seniority system. *See* FAC ¶¶ 110, 140.

3. The City's Office for Civil Rights openly promoted segregated training for City employees, specifically targeting training for white employees that promoted racial stereotypes of all white employees as being complicit in the "system of white supremacy" and "internaliz[ing] and reinforc[ing] racism." *See* FAC ¶ 77.

4. Supervisor Kilpatrick-Goodwill, Mr. Diemert's supervisor and supervisor of HSD's utility-assistance programs, told Mr. Diemert that it is impossible to be racist towards "white people," that all "white people" are racist, and that "black people" cannot be racist, thereby echoing the same racially hostile messaging disseminated in RSJI training and related workshops. *See* FAC ¶ 91.

5. On February 19, 2020, Mr. Said chest bumped Mr. Diemert, got in his face, accused him of having "white privilege," and suggested that Mr. Diemert only reported him for his fraudulent conduct because he was a racist. Mr. Said went on to espouse more racial stereotypes, echoing the racial stereotyping the City teaches in their mandatory RSJI classes. The City did not offer any solution apart from suggesting Mr. Diemert move away from his preferred workstation. Mr. Diemert was forced to continue reporting to him. *See* FAC ¶¶ 56–58, 120–121.

6. In 2020, Mr. Diemert was told by coworkers that his comments about "white privilege" were invalid solely because he was white, and they proceeded to make general disparaging comments about "white people." *See* FAC ¶ 98.

P. Oppo. to Mot. to Dismiss - 5
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

7. In January 2021, Supervisor Kilpatrick-Goodwill retaliated against Mr. Diemert because he had filed his EEOC charge on December 23, 2020, and because he had voiced his objections to the City's RSJI on numerous occasions, subjecting him to scrutiny to which no similarly situated coworker was subjected. *See* FAC ¶ 134.

8. In June 2021, Race and Social Justice Lead/Chief Equity Officer Edward Odom shared an article about critical race theory and laws attempting to ban the teaching of it, drawing specific attention to the 1921 Tulsa Race Massacre. Mr. Diemert commented on the post that Mr. Odom shared. Mr. Odom responded by telling him that because he was white, he should feel guilty for what happened 100 years earlier in Tulsa. Mr. Odom then sent Mr. Diemert an aggressive and condescending email further attacking him for his comments. *See* FAC ¶ 99. Mr. Odom shared his criticism of Mr. Diemert with many other senior staff members in the IT Department and elsewhere who disparaged Mr. Diemert in both public and private. *See* FAC ¶ 100.

9. On June 21, 2021, Mr. Diemert complained in an email to Senior Officer Groce about the racially stereotyping and denigrating comments he was constantly facing, requesting that he just be allowed to do his job without being subjected to racial harassment. He asked to create an affinity group opposed to racial stereotypes, but his request was denied and he was instead required to support the City's commitment to RSJI. *See* FAC ¶¶ 88–89.

10. In February or March 2020, Mr. Diemert raised his concerns with his Supervisor, Kilpatrick-Goodwill, about the radicalized training and RSJI material. Thereafter, Supervisor Kilpatrick-Goodwill retaliated against Mr. Diemert by ceasing to support him and cancelling meetings, although she continued to meet and support similarly situated coworkers. *See* FAC ¶ 136.

11. Mr. Diemert also experienced actions with an FMLA request in 2021, because of his race and in retaliation to his complaints. In July 2021, the Department of Labor found that the

P. Oppo. to Mot. to Dismiss - 6
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

City violated Mr. Diemert's FMLA rights by denying him a reduced work schedule and leave for biannual medical treatment. *See* FAC ¶ 137.

12. Throughout 2021, Mr. Diemert continued to notify his supervisors and others that his health was suffering because of the racial harassment that he experienced. *See* FAC ¶ 139.

13. In 2021, the City's Department of Human Resources conducted a haphazard and biased investigation into Mr. Diemert's claims of discrimination. Mr. Kuykendall wrote the first draft of his report finding no fault even before he completed his investigation and without thoroughly investigating Mr. Diemert's claims. *See* FAC ¶¶ 130–131.

With respect to the incidents that predate the filing deadlines for Mr. Diemert's federal and state law claims, they are evidence of the continuing pattern of the discriminatory and harassing conduct that defined the racially hostile work environment Mr. Diemert experienced.

### E. Mr. Diemert Properly Filed His Tort Claim Form Prior to Bringing His State Law Claims

Mr. Diemert fully complied with RCW 4.96.020 and more than sixty calendar days have elapsed since Daniel Brown, a City Services Manager, signed off on having received Mr. Diemert's tort claim form. *See* Exh. 6 to FAC, Dkt. 11-6. Mr. Diemert submitted the "State of Washington Standard Tort Claim Form" which is provided as an option on the City's website.[4] Mr. Diemert mailed his form to the City Clerk's Office at the address listed on the City's website. The City confirmed that it received Mr. Diemert's form. *See* **Exh. 1**.

### III.   STATEMENT OF ISSUES

There is a single issue for this Court to resolve—whether the facts Mr. Diemert alleges in the FAC sufficiently state a "plausible" ground for relief or if the City has shown "beyond doubt" that Mr. Diemert "can prove no set of facts in support of the claim" that would entitle him to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Iqbal*, 556 U.S. at 678;

---

[4] https://www.seattle.gov/city-finance/file-a-damage-claim.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

*Aguayo*, 653 F.3d at 917. Because Mr. Diemert has alleged plausible grounds for relief, the City's motion should be denied.

## IV.     ARGUMENT

### A.  Standard of Review

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts must take all facts in the complaint as true, make all reasonable inferences in favor of the plaintiffs, and determine whether the complaint states a plausible claim for relief. *Ashcroft*, 556 U.S. at 678. A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

At the pleading stage, "general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). There is no "probability requirement" at the pleading stage. *Twombly*, 550 U.S. at 556. Instead, plaintiffs must allege facts sufficient to "raise a reasonable expectation that discovery will reveal evidence" that plaintiffs are entitled to relief. *Id.* A well-pleaded complaint may proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* (cleaned up).

### B.  Mr. Diemert Has Alleged a Plausible Hostile Work Environment Claim

The City mischaracterizes Mr. Diemert's hostile work environment claim, suggesting that he *only* alleges unwelcome RSJI programming. MTD, Dkt. 19-1 at 4, 8, 12. That is wrong. The "fundamental premise" of Mr. Diemert's complaint is **not** that "he was harmed…by being educated about the realities of systemic discrimination," but rather the City subjected him to a hostile work environment because of his race. Mr. Diemert further shows that the City welcomes this hostile work environment as it teaches its employees to unquestionably associate "white" with "privilege" and invidious "supremacy," leading employees to judge and denigrate Mr. Diemert based on his race. *See* FAC ¶¶ 40, 44–45, 47, 70, 74, 77, 106, 131.

To prevail on a hostile workplace claim premised on race, an employee must show: (1) that he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct

P. Oppo. to Mot. to Dismiss - 8
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004). To determine whether the conduct complained of was sufficiently severe or pervasive to violate Title VII, "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," are considered. *Vasquez*, 349 F.3d at 642. In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Id*. That is, that both Mr. Diemert personally and a reasonable person in the same situation would have found the conduct unwelcome and abusive.

Mr. Diemert has plausibly alleged that he was subjected to verbal and physical conduct of a racial nature, that the conduct was unwelcome, and that with respect to the totality of the circumstances, the City subjected him to an abusive and hostile work environment. The City claims that Mr. Diemert was not "singled out or treated differently" because the RSJI applied to all employees. MTD, Dkt. 19-1 at 16. But this assertion ignores two key precepts—the City designed RSJI so that employees are required to be treated *unequally* and the extensive allegations in the FAC show how the City created an unrelenting hostile work environment for Mr. Diemert personally. *See, e.g.*, FAC ¶ 33 ("Supervisor Inay berated Mr. Diemert for using his 'white privilege' to keep the position and told him he was responsible for denying a 'person of color' an opportunity for promotion…."); FAC ¶ 34 ("Mr. Diemert did not receive any support as Mr. Sharkey supported Supervisor Inay's racial views."); FAC ¶ 48 ("Upon introducing himself to YFE Manager Javier Pulido, Mr. Pulido condescendingly asked Mr. Diemert, 'what could a straight white male possibly offer our department?'"); FAC ¶ 58 ("Mr. Said chest bumped Mr. Diemert, got in his face, told him he had 'white privilege'….") FAC ¶ 131 ("The incomplete investigation and the inaccurate and one-sided nature of the report again showed Mr. Diemert that there was no chance that the Department or the City would abandon its relentless RSJI push. To Defendant, Mr. Diemert was merely a member of a disfavored racial group.").

P. Oppo. to Mot. to Dismiss - 9
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Moreover, the FAC also emphasizes how the City uses RSJI to divide employees by race, encourage segregated meetings and affinity groups, and delineate specific tasks for members of each "race" to accomplish. *See* FAC ¶¶ 41–42, 44, 65 ("[T]he facilitators at the event stated that 'white people are like the devil,' that 'racism is in white people's DNA,' and that 'white people are cannibals.'").

Many courts have found that such programs and such comments can and do support claims of a hostile work environment, even with facts that do not rise to the level of what Mr. Diemert has alleged. For example, in *Mais v. Albemarle Cnty. Sch. Bd*., No. 3:22-CV-51, 2023 WL 2143471, at *8–10 (W.D. Va. Feb. 21, 2023), an assistant principal brought complaints to administrators about antiracism training that demonized staff members for being white. *Id*. at *1. In response to these complaints, the training leader did not alter the training content. *Id*. The assistant principal also complained to the principal about the aide causing her emotional distress and disrupting her work after the aide called her offensive names, but the principal took no action to address these concerns. The assistant principal would go on to resign following further mistreatment, such as being told that she was acting like "a typical defensive white person" by discussing her feelings. *Id*. at *3. The court found that these allegations, which mirror some of Mr. Diemert's allegations, properly pled a Title VII claim and survived a motion to dismiss. *Id*. at *8–10. *See also Devine v. Pittsburgh Bd. of Pub. Educ*., No. 2:13-CV-220, 2015 WL 3646453 (W.D. Pa. June 10, 2015) (denying a motion to dismiss where plaintiff alleged that her supervisor terminated her due to her race by applying a different performance standard to teachers she associated with "white privilege"). Similarly, in *Hartman v. Pena*, 914 F. Supp. 225, 229 (N.D. Ill. 1995), a male employee with the Federal Aviation Administration attended a required "Cultural Diversity Workshop" in which female attendees were directed to deride male participants, and other female participants physically harassed the males. *Id*. at 227–28. The plaintiff felt pressured to participate in the workshop. The court found this conduct to be both subjectively and objectively hostile. *Id*. at 230.

P. Oppo. to Mot. to Dismiss - 10
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

The City does not deny that Mr. Diemert pled that the racial conduct and comments he details were unwelcome, but it claims that *as a matter of law*, the allegations do not reach the level of "objective harassment" and that no "reasonable person" in Mr. Diemert's situation could find RSJI to be "abusive or hostile." *See* MTD, Dkt. 19-1 at 18. That is nonsense. The claims and facts Mr. Diemert has pled would shock the conscience of all but the most ardent believers of race essentialism. Moreover, *Mais*, *Devine*, and *Hartman* directly refute the City's argument. Those cases present situations far less extreme than the City's actions here, yet each court rejected attempts to dismiss the complaint. The determination of "reasonableness" belongs with the fact finder, and the City provides no support for its contrary contention, much less any authority supporting a motion to dismiss.

The City would further have the Court overlook properly pled allegations by wrongly construing them as outside the statute of limitations. MTD, Dkt. 19-1 at 17 n.7. Mr. Diemert outlines a series of discriminatory events in his FAC that constitute a continuing violation of Title VII. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002) (events occurring prior to the statute of limitations are not time-barred if they are part of the same unlawful employment practice and at least one event took place inside the limitations period). Mr. Diemert has alleged that recurring negative stereotypes were taught in training workshops, while derogatory comments and discriminatory decisions about him were made by colleagues and managers, over many years, and more than one of them occurred within the statute of limitations. *See* FAC ¶¶ 90–102, 104–110, 129–132.

Mr. Diemert, therefore, has alleged many events, comments, and other unwelcome racial conduct occurring over years that support his claim that his employment with the City was marked by severe and pervasive racial harassment. He was coerced to resign from a lead role, humiliated, subjected to discriminatory training, experienced pronounced discrimination from his supervisors and colleagues, and was left completely unsupported whenever he complained about the discrimination he was experiencing. *See* FAC ¶¶ 38–45, 56–58, 62, 69–71, 74–75, 77, 80–87, 90–95, 97–101, 110, 120–121, 140. *See, e.g.*, *Vasquez*, 349 F.3d at 642; *Mais*, 2023 WL

2143471, at *8–10; *Devine*, 2015 WL 3646453; *Hartman*, 914 F. Supp. at 229; *see also Hernandez v. City of Vancouver*, 277 F. App'x 666, 670–71 (9th Cir. 2008) ("human resources personnel investigating complaints dismissed his charges of racism as 'sarcastic'; and, superiors and co-workers had made racist comments regarding Hispanics generally…. Hernandez's allegations of hostility, if credited, describe conduct that 'pollute[d] [Hernandez's] workplace, making it more difficult for [him] to do [his] job, to take pride in [his] work, and to desire to stay on in [his] position.'").

### C.  Mr. Diemert Has Alleged a Plausible Disparate Treatment Claim

For Mr. Diemert to plead a plausible disparate treatment claim, he must show that (1) he is a member of a protected class; (2) he was qualified for his job position and performed his job satisfactorily; (3) he experienced an adverse employment action; and (4) "similarly situated individuals outside his protected class were treated more favorably" or there are other circumstances surrounding the adverse employment action that give rise to an inference of discrimination. *Knight v. Brown*, 797 F. Supp. 2d 1107, 1125 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012). The first two elements are not at issue, but the City argues that Mr. Diemert did not experience an adverse employment action and that Mr. Diemert has not alleged discriminatory intent. *See* MTD, Dkt. 19-1 at 19–20. The City is wrong.

Mr. Diemert experienced a series of adverse employment actions. "An adverse employment action is one that 'materially affect[s] the compensation, terms, conditions, or privileges of…employment.'" *Knight*, 797 F. Supp. 2d at 1125 (citing *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Mr. Diemert has pled many, including, but not limited to, less favorable treatment in work/project assignments, hours, and promotions; failure to address his genuine concerns; creating a confidential file about him; subjecting him to increased scrutiny; interfering with his FMLA rights; coercing him into stepping down out of a lead position because of his race; denying him back pay for out-of-class work but requiring him to complete this type of work anyway; and forcing him to continue reporting to the supervisor that had physically accosted him. *See* FAC ¶¶ 32–37, 47, 101, 111–125, 128, 137–143, 171–172. The continued

subjection to unwelcome conduct based on Mr. Diemert's race took a serious toll on his health and compelled him to resign, resulting in a constructive discharge. Each of these actions individually and all of them collectively constitute adverse actions under Title VII. *See Knight*, 797 F. Supp. 2d at 1125 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)).

Likewise, RSJI is *not* "race neutral"—to the contrary, it is *race mandatory*. *See* MTD, Dkt. 19-1 at 20. It plainly evinces the City's discriminatory intent towards Mr. Diemert because RSJI explicitly makes racial distinctions and assigns negative attributes to people because of their race. It encouraged managers and employees to make denigrating and stereotyping comments to others, including Mr. Diemert, based solely on a person's race, and encouraged employment decisions to be made on a racial basis.[5] The City openly acknowledged its discriminatory intent to benefit BIPOC employees over other employees on numerous occasions—it is exactly this RSJI-inspired intent that led the City to giving similarly situated BIPOC employees more favorable treatment in work/project assignments, hours, and promotions; subjecting Mr. Diemert to increased scrutiny, conducing a haphazard investigation into his discrimination claims, interfering with his FMLA rights, denying him backpay, reducing his workload, cancelling his regularly scheduled meetings with his supervisor, delaying the provisions of remote work support, and forcing Mr. Diemert to continue reporting to Mr. Said. *See* FAC ¶¶ 110, 119–121, 130–132, 136–137, 171. Indeed, the FAC, goes into detail about the City's RSJI precisely to demonstrate the discriminatory and far-reaching parameters of its official policy. *See* FAC ¶¶ 38–45, 62, 69–71, 74–75, 77, 80–87, 90–95, 97–101, 110.

---

[5] This philosophy is alluded to in the City's own response, when it notes "as for the attack on 'white culture' that Plaintiff alleges, the RSJI does not attack white employees' values." MTD, Dkt. 19 at 6. "White culture" and "white values" are not statements Mr. Diemert would ever use. Mr. Diemert did explain *how* the City even injects race into objective and neutral concepts like "sense of urgency" and "objectivity." *See* Exh. 7 of the FAC, Dkt. 11-7. By characterizing these things as "white," the City proves Mr. Diemert's point. For the City—even before this Court— everything is always about race, even things that obviously aren't.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

### D.  Plaintiff Has Sufficiently Pled That He Was Constructively Discharged

Mr. Diemert has sufficiently alleged that he was constructively discharged because the facts he asserts indicate recurring discriminatory treatment that would lead a reasonable person to resign. "A constructive discharge occurs when, looking at the totality of the circumstances, a reasonable person in the employee's position would have felt that he was forced to quit because of intolerable and discriminatory working conditions." *Sanchez v. City of Santa Ana*, 915 F.2d 424, 439 (9th Cir. 1990) (quoting *Watson v. Nationwide Ins. Co*., 823 F.2d 360, 361 (9th Cir. 1987)). *Accord*, *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000); *Nielson v. AgriNorthwest*, 95 Wn. App. 571, 578 (1999); *Washington v. Boeing Co*., 105 Wn. App. 1, 15–16 (2000); *Sneed v. Barna*, 80 Wn. App. 843, 849 (1996). An employer acts "deliberately" if its deliberate act creates the intolerable condition, without regard to the employer's intent as to the resulting consequence. *Sneed*, 80 Wn. App. at 849. "Whether working conditions are so intolerable and discriminatory as to justify a reasonable employee's design to resign is normally a factual question for the jury." *Sanchez*, 915 F.2d at 431; *Short v. Battle Ground Sch. Dist*., 169 Wn. App. 188, 206 (2012), *disapproved on other grounds*, *Kumar v. Gate Gourmet Inc.*, 180 Wn.2d 481 (2014).

The City dismisses the severity of the discriminatory environment that Mr. Diemert faced, referring to it as merely "dissatisfaction with the City's racial equity work…." MTD, Dkt. 19-1 at 19. Mr. Diemert experienced far more than a mere dissatisfaction with the RSJI. He was demeaned, insulted, denied opportunities, racially harassed, subjected to intimidation, and suffered physically and emotionally—precisely the type of conditions that would lead a reasonable person to resign. *See* FAC ¶¶ 38–45, 110, 119–121, 130–132, 136–137, 171.

### E.  Plaintiff Has Pled a Plausible Retaliation Claim

To make a prima facie case of retaliation, a plaintiff must establish that he undertook a protected activity under Title VII, his employer subjected him to an adverse employment action, and there is a causal link between those two events. *Vasquez*, 349 F.3d at 646. Mr. Diemert has pled each of these elements in his amended complaint.

P. Oppo. to Mot. to Dismiss - 14
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Mr. Diemert undoubtedly alleges with sufficiency that he undertook protected activity that led to the City's retaliation against him. An employee undertakes a protected activity when the employee reports "an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf v. W. Coast Contractors of Nev., Inc*., 712 F.3d 417, 422 (9th Cir. 2013); *see also Cheatham v. City of Phoenix*, 699 F. App'x 647, 648–49 (9th Cir. 2017). Protected activity includes "engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough Sch. Dist*., 323 F.3d 1185, 1197 (9th Cir. 2003).

Even a plaintiff's mistaken belief that his employer violated Title VII may be reasonable, as the court assesses the reasonableness of the plaintiff's belief "according to an objective standard—one that makes due allowance…for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims," and not by whether the employer's conduct was actually unlawful. *See Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994).

Here, it is undisputed that Mr. Diemert filed complaints of harassment and discrimination with the EEOC. FAC ¶¶ 15–16, 133. Moreover, Mr. Diemert further alleges that he made numerous complaints about racial discrimination to his supervisors, union representatives, and managers within the 300 days leading to the filing of his EEOC charge and prior to that time as well— which the City also does not dispute. *See* FAC ¶¶ 47–60, 120. His complaints included, among others, those made to his supervisor for divisive and discriminatory comments from co-workers, those made to a planning and development specialist about a racially offensive white caucus meeting, and those made to a director regarding the City's failure to address incidents when he reported them. *Id*. These complaints, including informal ones, clearly constitute protected activity. *Passantino v. Johnson & Johnson Consumer Prods., Inc*., 212 F.3d 493, 506 (9th Cir. 2000) (stating that "informal complaints constitute a protected activity" and "actions taken against [the plaintiff] after these initial complaints are appropriately the subject of [a] retaliation claim").

P. Oppo. to Mot. to Dismiss - 15
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Given the multiple allegations of explicit racial training (negatively stereotyping only white people), racially discriminatory comments (e.g., "white people are like the devil," and "white people are cannibals"), and physical intimidation by his supervisor, as set forth by Mr. Diemert in the complaint, it is frankly incredible that the City attempts to argue that Mr. Diemert did not have a reasonable good faith belief that the conduct he repeatedly complained of was unlawful—especially given that the City's toxic work environment came under scrutiny by the United States Department of Justice in August of 2020. *See* FAC ¶ 80. The City fails to provide any authority that Mr. Diemert's complaints were not plausibly based on a reasonable belief that the City's actions were unlawful.

Mr. Diemert also sufficiently alleges that the City's adverse actions against him were retaliatory. To be adverse, an employment action must be such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," even if the action did not affect "the terms and conditions of employment." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006). "[T]he significance of any given act of retaliation will often depend on the particular circumstances." *Id.* at 69. An action need not rise to the level of an ultimate employment action, such as discharge, change in job title, or reduction in pay, to be an adverse action supporting a claim for retaliation. *See Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000). The numerous adverse actions to which Mr. Diemert was subjected are detailed above, including but not limited to belittling him, forcing him to report to a hostile supervisor, interfering with his FMLA rights, withdrawing support, and subjecting him to sudden intense scrutiny.

The causal link between Mr. Diemert's protected activity and the City's actions can be inferred from circumstantial evidence such as the City's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action. *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (stating that to support "an inference of retaliatory motive, the [adverse action] must have occurred fairly soon after the employee's protected expression").

P. Oppo. to Mot. to Dismiss - 16
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Given that a significant portion of the City's adverse treatment of Mr. Diemert occurred in the six months after he filed his EEOC complaint, the Court may infer that this treatment was retaliation against Mr. Diemert filing the complaint. *See, e.g.*, *Johnson v. Alameda-Contra Costa Transit Dep't*, No. 04-4879, 2006 WL 2587293, at *7 (N.D. Cal. Sept. 8, 2006) (temporal proximity of three to four months supports inference of retaliation); *see also Pringle v. Wheeler*, 478 F. Supp. 3d 899, 918 (N.D. Cal. 2020) (plaintiff plausibly alleged that leave denials occurring eight months after he filed an EEOC complaint were retaliatory); *Adetuyi v. City & Cnty. of San Francisco*, 63 F. Supp. 3d 1073, 1090 (N.D. Cal. 2014) (finding that the five-year delay between a black city employee's lawsuit against his employer and his former supervisor alleging harassment and retaliation, and the city's later decision declining to promote employee, was not so lacking in temporal proximity that it failed to give rise to an inference of causation).

## F.  Mr. Diemert Has Plausibly Alleged a Violation of the Equal Protection Clause

Mr. Diemert has adequately alleged that the City discriminated against him because of his race, and thereby denied him his constitutional right to equal protection of the laws. Mr. Diemert clearly identifies the moving force behind the constitutional violations he experienced—the very Race and Social Justice Initiative the City openly lauds and acknowledges in its motion. *See generally* MTD, Dkt. 19-1.

The Fourteenth Amendment provides that "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The purpose of the Equal Protection Clause of the Fourteenth Amendment is to "secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sunday Lake Iron Co. v. Wakefield Twp.*, 247 U.S. 350, 352 (1918). Pursuant to 42 U.S.C. § 1983, a plaintiff alleging a violation of equal protection must plead that the defendants, acting under color of state law, deprived him of rights secured by the Constitution or federal statutes. *Ortez v. Washington Cnty., Or.*, 88 F.3d 804, 810 (9th Cir. 1996). The plaintiff must show that the defendant "acted in a discriminatory manner," that the discrimination was "intentional," and that

it occurred because of his membership in a protected class. *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005). Intentional race discrimination violates "equal protection unless narrowly tailored to serve a compelling state interest." *Alaska v. EEOC*, 564 F.3d 1062, 1068 (9th Cir. 2009).

"A municipality may be held liable under § 1983 if the plaintiff proves that a government employee committed the alleged violation pursuant to a formal government policy or a 'longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity.'" *Watts v. Cnty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). *See also Ortez*, 88 F.3d at 811 (citing *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988), and noting that a "claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the actions of individual municipal employees conformed to official policy, custom, or practice").

Mr. Diemert's FAC details each of these elements. It outlines how the City and various employees of the City intentionally discriminated against him and harassed him because of his race, how he was treated differently from similarly situated employees, and how this behavior conformed to and was, in fact, encouraged by the City's Race and Social Justice Initiative. *See* FAC ¶¶ 33, 35, 48, 56–58, 69, 88–89, 99, 130–131. As a public employee, Mr. Diemert was entitled under the Equal Protection Clause to be free from purposeful workplace harassment and discrimination on the basis of his race. *See Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 707 (9th Cir. 2010) (citing *Alaska v. EEOC*, 564 F.3d 1062, 1069 (9th Cir. 2009) (en banc); *Bator v. Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994)). Unfortunately for Mr. Diemert, his experience was quite the opposite—from being told that he should resign from a lead position because he had "white privilege" (FAC ¶ 33) to being physically accosted by a supervisor who was also making derogatory racial comments to him and being told that Mr. Diemert and members of "his race" were responsible for various atrocities committed long ago by other people (FAC ¶¶ 57–58), the City was not only aware of this discrimination but was actively

P. Oppo. to Mot. to Dismiss - 18
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

involved in encouraging and promoting this behavior through its RSJI. FAC ¶ 91; *see also* MTD, Dkt. 19-1 at 4 ("[T]he City…is proud to have created a powerful program that works today to incorporate principles of racial equity into ***all aspects*** of its programming.") (emphasis added).

The City contends that "there is no cognizable race-based classification or action at issue in this case," but then repeatedly details its race-based classifications. *See* MTD, Dkt. 19-1 at 5 ("RSJI trainings educate all employees on racial equity principles…."); pg. 6 ("RSJI…sheds light on how certain values—a sense of urgency, for example—are rooted in a history of white supremacy…."); pg. 7 ("Another component of RSJI is the Race Equity Toolkit…."); pg. 15 ("RSJI is motivated in part by disparities by race…."). The City completely ignores the majority of Mr. Diemert's allegations, including the racial harassment he personally experienced and how similarly situated employees were treated more favorably. Furthermore, the interactions Mr. Diemert had with his colleagues and supervisors implicate municipal liability because those individuals were acting pursuant to the City's RSJI. *See* MTD, Dkt. 19-1 at 23 (admitting that the RSJI and use of critical race theory is "encouraged"). The ultimate crux of the City's argument is that it disagrees with the allegations at issue (or at least offers a different interpretation of the alleged events and the City's conduct), but this is entirely irrelevant for purposes of evaluating whether Mr. Diemert has plausibly pled an equal protection claim.

Moreover, whether the RSJI is narrowly tailored to achieve a compelling purpose is premature on a motion to dismiss. This is something to be determined after discovery and fact-finding, not on a motion to dismiss where the plaintiff's allegations must be taken as true. *Ashcroft*, 556 U.S. at 678 (pleading standard is a plausibility standard, not a probability standard). *See also Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (noting that the burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality belonged to the city, and where there was a race-based affirmative action plan subject to strict scrutiny, the city had to meet its burden "after its Motion to Dismiss"). *See also Duronslet v. Cnty. of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017) ("[T]he Court finds it premature to determine either the level of scrutiny to apply or

P. Oppo. to Mot. to Dismiss - 19
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

whether the County's policy can withstand such scrutiny. Both are fact-dependent inquiries that are unsuitable for resolution at the pleading stage.").

Because Mr. Diemert has adequately alleged that the City discriminated against him because of his race, denied him equal protection of the laws, and identified the moving force behind the constitutional violations he experienced, he has plausibly alleged an equal protection claim.

### G.  Mr. Diemert Submitted a Tort Claim Form

Mr. Diemert fully complied with RCW 4.96, *et seq*., and this Court should not dismiss his WLAD claims. Mr. Diemert mailed the tort claim form provided on the City's website[6] via certified mail. The exhibit attached to the amended complaint is the verification signature from the City that it received Mr. Diemert's tort claim form. Mr. Diemert also received a letter from the City on January 18, 2023, indicating that it had received notice of Mr. Diemert's claim. *See* **Exh. 1**. Should this Court require Mr. Diemert to re-serve his form on the City, it should grant Mr. Diemert leave to amend his complaint. *See Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d 1155, 1165–66 (W.D. Wash. 2016) (citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051–52 (9th Cir. 2003)). The policy favoring amendment is to be applied with "extreme liberality." *Id.* at 1165.

### CONCLUSION

For the foregoing reasons, the City's Motion to Dismiss should be denied. In the alternative, should the Court grant the City's Motion, it should dismiss the complaint with leave to amend.

### LOCAL CIVIL RULE 10 CERTIFICATION

The undersigned hereby certify that this memorandum contains 7,381 words, in compliance with the Local Civil Rules.

---

[6] https://www.seattle.gov/city-finance/file-a-damage-claim;
https://www.seattle.gov/documents/Departments/CityFinance/FilingADamageClaim/Washington-state-standard-tort-claim-form.pdf.

*Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484*

DATED:  April 3, 2023.

Respectfully submitted:

PACIFIC LEGAL FOUNDATION

*s/ Laura M. D'Agostino*
LAURA M. D'AGOSTINO
Virginia Bar No. 91556 *
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
LDAgostino@pacificlegal.org

*s/ Andrew R. Quinio*
ANDREW R. QUINIO
California Bar # 288101 *
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
AQuinio@pacificlegal.org

*s/ Brian T. Hodges*
BRIAN T. HODGES, WSBA # 31976
1425 Broadway, #429
Seattle, Washington 98122
Telephone: (425) 576-0484
Fax: (916) 419-7747
BHodges@pacificlegal.org

*Counsel for Plaintiff*
* *Pro hac vice*

P. Oppo. to Mot. to Dismiss - 21
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

### CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record. I also emailed a courtesy copy to all counsel of record.

*s/ Laura M. D'Agostino*
LAURA M. D'AGOSTINO
Virginia Bar No. 91556 *

*Attorney for Plaintiff*
*\* pro hac vice*

P. Oppo. to Mot. to Dismiss - 22
2:22-cv-01640-LK

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*