UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOSHUA A. DIEMERT, | CASE NO. 2:22-cv-1640 |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |
| v. | |
| CITY OF SEATTLE, a municipal corporation, | |
| Defendant. | |

## INTRODUCTION

This is an employment case, in which Plaintiff Joshua Diemert alleges that Defendant City of Seattle, his former employer, discriminated against him and subjected him to a racially hostile-work environment because he is white. Diemert alleges the City retaliated against him when he complained about the way that he was treated, and that when he could no longer take it, he was forced to resign.

The City moved to dismiss Diemert's claims under Rule 12(b)(6). The bar is low for Diemert to avoid dismissal on such a motion, as the Court must evaluate only whether Diemert has alleged sufficient facts to state a plausible claim for relief, not whether his claims have any

likelihood of success on the merits. Cabined by this standard, the Court GRANTS in part and DENIES in part the City's motion as explained below.

## BACKGROUND

The Court accepts all facts as true from the complaint and construes them in the light most favorable to Diemert. Fed. R. Civ. P. Rule 12(b)(6).

Diemert began working as a program intake representative for the City of Seattle, Human Services Department ("HSD") in January 2013. Dkt. No. 11 at 5. Although he does not describe his racial background in the complaint, Diemert alleges the City classified him as white. *Id.* He claims his race became an "albatross around his neck" as a "deliberate outgrowth of the City's Race and Social Justice Initiative ('RSJI')." *Id.* at 2. In effect since 2005, RSJI is a city-wide program that requires race-based thinking and decision-making, which "is based on the foundational premise that American society has 'internalized and normalized' culture and practices that are 'rooted in white supremacy, colonialism, classism, Christian hegemony, sexism, heterosexism, physical ableism, [and] mental health oppression[.]" *Id.* at 7. Diemert attended mandatory RSJI trainings. *Id.* at 11. He alleges RSJI applied differently to City employees depending on their racial identity, and that it divided employes into two groups: "Black, Indigenous and People of Color (BIPOC)," on the one hand, and "white folks," on the other. *Id.* at 8. Diemert alleges he experienced severe discrimination and harassment because of the City's pervasive focus on race and "supposed 'white supremacy,'" and that he was consistently treated worse than his BIPOC colleagues. *Id.* at 8.

Diemert alleges he experienced disparate and hostile treatment during his employment until he was forced to resign in September 2021. *Id.* at 5, 25–26. For example, starting in August 2015, a Youth and Family Empowerment Division Manager, allegedly asked Diemert, "What could a straight white male possibly offer our department?" *Id.* at 8. In 2016, a Director-level

employee told Diemert it was "impossible to be racist toward 'white people.'" *Id.* Another

Director-level employee repeated a similar sentiment during a mandatory RSJI training, and

added that all white people have white privilege and are racist. *Id.* at 15–16. Also in 2016,

Diemert claims he received no support from his supervisors while serving in a "lead" position

within his department. *Id.* at 5. When Diemert reported his concerns to his supervisor, he alleges

she told him he should step down and that he used his white privilege to retain the position and

that he was denying a person of color an opportunity for promotion. *Id.* at 6. Diemert alleges he

was coerced to resign his lead position and returned to working as a program intake

representative. *Id.*

In 2017, Diemert's coworker called him privileged and labeled him racist, also calling his

words "violence" and an invasion of her "safe space." *Id.* at 16.

At some point after he stepped down from the lead position, Diemert alleges Shamsu

Said became his supervisor or "team lead."[1] In October 2019, Diemert alleges Said misused his

authority by "being aware that his sister was ineligible for [a] program, submitting the

application on her behalf, and being directly involved in the business[.]" *Id.* at 10, 22. Diemert

reported Said to the Mayor's Officer Operations Manager. *Id.* at 10. On February 19, 2020,

Diemert alleges Said "chest bumped" him, got in his face, and told Diemert he had white

privilege and racist motives. *Id.* Diemert informed the Ethics Department about his altercation

with Said, causing the City to move Said "a few feet away from [Diemert's] workstation." *Id.* at

10, 21.

---

[1] The City disputes Diemert's characterization of Said as his supervisor. Dkt. No. 24 at 7.
Diemert alleges Said evaluated and oversaw his work. Dkt. No. 11 at 21. Because this is a
motion to dismiss, the Court need not resolve the issue, and will simply accept Diemert's
allegation as true.

Diemert alleges the City required he attend trainings in which he and the other attendees played "privilege" bingo. *Id.* at 12. In 2019, Diemert also allegedly attended an "Undoing Institutional Racism" workshop hosted by El Centro De La Raza, in which the facilitators allegedly stated, "white people are like the devil," "racism is in white people's DNA," and "white people are cannibals." *Id.* at 11. In June 2020, the Office of Civil Rights invited Diemert to attend a training on Internalized Racial Superiority "specifically targeted for white employees." *Id.* at 13. Defendant allegedly promoted "race-specific 'affinity groups' or 'caucuses'" where "people of color and white people . . . meet separately in order to do . . . different work." *Id.* at 14.

In 2020, Diemert's supervisor allegedly told him that his coworkers were calling him racist and hateful. *Id.* at 11. At one point, Diemert witnessed a group of employees discussing white privilege and joined their conversation. *Id.* at 17. The members of the group allegedly told Diemert, because he is white, he did not have the right to speak about oppression faced by Black people and, in doing so, he discredited their lived experience. *Id.*

On December 23, 2020, Diemert filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC). *Id.* at 23. Diemert amended this charge to include retaliation on January 16, 2023. *Id.* at 4. Diemert also filed an additional EEOC charge on June 30, 2022, for discrimination he allegedly experienced between December 23, 2020, and September 7, 2021. *Id.*

Diemert claims that filing these charges led to harassment. In January 2021, Diemert inquired why the inbox for public emails was not being checked. *Id.* at 24. In response, one of his supervisor's allegedly sent an email asking, "how many applications does [Diemert] have sitting in the drawer . . . what is the oldest date of his applications and delays?" *Id.* The same supervisor also cancelled most of her regularly scheduled meetings with Diemert in 2021 even though she

continued to meet with other employees. *Id.* Diemert alleges that, because he could not meet with his supervisor, he did not receive approval to use Adobe PDF software even though "it was crucial for his day-to-day work." *Id.* The same year, Diemert "experienced issues with an [Family Medical Leave Act (FMLA)] request" and Human Resources gave him incorrect instructions on how to correct his medical certification. *Id.* at 24–25. In August 2021, because of staffing shortages, the City allegedly told Diemert it could no longer accommodate his request to work from home. *Id.* at 25. Diemert believed employees of color were given priority to telework, and he resigned in September 2021. *Id.*

Diemert alleges the City violated the Equal Protection Clause of the 14th Amendment, Title VII of the Civil Rights Act of 1964, as amended, and the Washington Law Against Discrimination (WLAD).

## DISCUSSION

### I.      Rule 12(b)(6) Standard of Review.

The Court will grant a motion to dismiss only if the complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). The plausibility standard is less than probability, "but it asks for more than a sheer possibility" that a defendant did something wrong. *Iqbal*, 556 U.S. at 678 (citations omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). In other words, a plaintiff must plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

When considering a motion to dismiss, the Court accepts factual allegations pleaded in the complaint as true and construes them in the light most favorable to the plaintiff. *Lund v. Cowan*, 5 F.4th 964, 968 (9th Cir. 2021). But courts "do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Id.* (internal quotation marks omitted).

## II.    Diemert alleges enough facts to state a plausible claim for a hostile-work environment based on race.

Diemert alleges the City subjected him to a hostile-work environment because of his race. To succeed on this claim, Diemert must show (1) that he was "subjected to verbal or physical conduct because of [his] race," (2) that the conduct was "unwelcome," and (3) that "the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003) (internal quotation marks omitted). "'The working environment must both subjectively and objectively be perceived as abusive.'" *Id.* at 800 n.6 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir.2000)). The WLAD's formulation of a hostile-work environment claim is largely the same as Title VII's. *Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 712 (Wash. 1985); *see Sangster v. Albertson's, Inc.,* 991 P.2d 674, 679 (Wash. Ct. App. 2000) ("The *Glasgow* formulation of the elements of sexual harassment is taken from federal cases interpreting Title VII."); *Fisher v. Tacoma Sch. Dist. No. 10*, 769 P.2d 318, 320 (Wash. Ct. App. 1989) (holding the hostile-work environment standard in *Glasgow* applied to race-based hostile work environment claims). There are additional nuisances to these elements, like whether the perpetrator of the alleged harassment was a supervisor or co-worker, but the Court need not engage them now to decide the current motion.

1    The City argues that Diemert cannot establish a hostile-work environment claim based on

2    the RSJI because the program is aimed at educating the City's workforce about "historical

3    atrocities, systemic bias, and white privilege," as opposed to a targeted campaign of harassment

4    against Diemert in particular. Dkt. No. 19-1 at 17. The City frames its argument as a question of

5    law, but offers no legal authority in support of its position. And given the standard of review, it

6    would be inappropriate for the Court to consider any evidence outside the complaint about the

7    operation and purposes of the RSJI to round out the record. The Court need not confront the

8    issue at this time, however, because the City frames Diemert's alleged hostile-work environment

9    claim too narrowly.

10   Here, it is clear on the face of Diemert's complaint that, beyond any problems he may

11   have had with the RSJI, he alleges his co-workers and supervisors verbally and physically

12   assaulted him because of his race. And that he was the target of potentially offensive comments

13   and other abusive actions, also because of his race. Diemert alleges this conduct was unwelcome,

14   and he has pleaded sufficient factual allegations showing a pattern of race-based harassment of a

15   repeated, routine, or generalized nature that affected his ability to do his job. *Reynaga v.*

16   *Roseburg Forest Prod.*, 847 F3d 678, 686–687 (9th Cir. 2017). Whether there is any merit to his

17   claims is an inquiry for another day, but for now, he has stated a plausible claim for a hostile-

18   work environment based on race under Title VII and the WLAD.

19   **III.   Diemert alleges enough facts to state a plausible claim for disparate treatment
            based on race.**

20   Diemert also alleges the City subjected him to disparate treatment because of his race.

21   Generally, the *McDonnell Douglas* analytical framework applies in disparate treatment cases,

22   under which the plaintiff must allege "(1) [they] belon[g] to a protected class, (2) [they were]

23   performing according to [their] employer's legitimate expectations, (3) [they] suffered an adverse

24

employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination."[2] *Reynaga*, 847 F.3d at 690–91; *see Cornwell v. Microsoft Corp.,* 430 P.3d 229, 234 (Wash. 2018) ("When evaluating the merits of cases brought under WLAD, we employ the *McDonnell Douglas*.").

The City argues that Diemert fails to state a claim because he did not "experience an adverse employment action and was not constructively discharged." Dkt. No. 19-1 at 19. An adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (internal quotations omitted). "The Ninth Circuit has recognized that only 'non-trivial' employment actions, such as 'termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion' qualify as adverse employment actions." *Knight v. Brown*, 797 F. Supp. 2d 1107, 1125 (W.D. Wash. 2011), *aff'd*, 485 F. App'x 183 (9th Cir. 2012) (quoting *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir. 2000)).

Diemert claims he experienced "a series of adverse employment actions," including:

[L]ess favorable treatment in work/project assignments, hours, and promotions; failure to address his genuine concerns; creating a confidential file about him; subjecting him to increased scrutiny; interfering with his FMLA rights; coercing him into stepping down out of a lead position because of his race; denying him back pay for out-of-class work but requiring him to complete this type of work anyway;

---

[2] Neither party addresses the circuit split in which some courts modify the requirements of the *McDonnell Douglas* test in so-called "reverse discrimination" cases, requiring the plaintiff to demonstrate "background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C.Cir.1981); *Teehee v. Bd. of Educ.*, 116 F.3d 486 n.2 (9th Cir. 1997) (recognizing circuit split). The Ninth Circuit has not taken a position on this inter-circuit dispute, *see Zottola v. City of Oakland,* 32 F. App'x 307, 311 (9th Cir. 2002), and nothing in the Court's ruling should be construed as deciding the issue now.

and forcing him to continue reporting to the supervisor that had physically accosted him.

Dkt. No. 22 at 14 (citing Dkt. No. 11).

The Court finds that Diemert has alleged sufficient facts, which must be taken as true at this early screening stage of the case, to show that he plausibly suffered an adverse employment action; that is, the treatment he experienced at work constituted a material change in the terms and conditions of his employment.

Moreover, as explained above, Diemert has stated a plausible hostile-work environment claim. A constructive discharge may result where, as Diemert has alleged, a workplace becomes so hostile and intolerable that a reasonable person in the employee's position would feel compelled to resign. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Deciding whether the alleged hostile-work environment Diemert faced was so egregious that it forced him to quit is beyond the scope of the Court's inquiry on the City's Rule 12(b)(6) motion, but based on the facts asserted, Diemert has stated a plausible constructive discharge claim. "If shown, a constructive discharge is an adverse employment action." *Jordan v. Clark*, 847 F.2d 1368, 1377 n.10 (9th Cir. 1988).

Although Diemert has stated a plausible racial disparate treatment claim, not all acts of alleged disparate treatment are timely. *See infra* Section VI.

## IV.     Diemert has stated an Equal Protection claim based on the City's Rase-Based Affinity Groups.

Diemert alleges the City violated the Fourteenth Amendment Equal Protection clause when it subjected him to "intentionally segregated staff meetings by race . . . [and] promoted affinity groups." Dkt. No. 11 at 26. Under *Monell,* plaintiffs suing municipal entities under Section 1983 for violating the Equal Protection Clause must show, among other things, "that their injury was caused by a municipal policy or custom." *Mohamed Sabra v. Maricopa Cnty.*

*Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022). The policy requirement is satisfied where the municipality "acted 'pursuant to an expressly adopted official policy.'" *Id.* (quoting *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021)).

As alleged in the complaint, the RSJI—the City's official policy—promoted caucuses through which white people and people of color would "meet separately in order to do [their] different work." Dkt. No. 11 at 14. In June 2020, a coworker allegedly invited Diemert to join an Office of Civil Rights training on Internalized Racial Superiority, "a training for white people[.]" Dkt. No. 11-15 at 2–3.[3]  Participation is voluntary—Diemert elected not to attend the available meetings. Diemert alleges that he tried to "sign up for a training reserved only for people of color," but he was harassed and advised that he should not sign up. Dkt. No. 11 at 13.

The City counters that Diemert "fail[ed] to allege sufficient facts to support a finding that he was treated differently based upon a protected class," Dkt. No. 19-1 at 13–14, but this is really an invitation to weigh the evidence or "forecast" Diemert's likelihood of success on the merits, *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12–13 (1st Cir. 2011). This the Court cannot do on a Rule 12(b)(6) motion.

The City argues in the alternative, that even if Diemert does allege sufficient facts to state an equal protection claim, it would not matter because "the RSJI is narrowly tailored to achieve the compelling state interest of eradicating systemic racism within the City's workforce." Dkt. No. 19-1 at 13–14. The City's policy, as alleged, however, appears to encourage employees to attend different trainings based on their race, so the City must establish these affinity group distinctions are narrowly tailored to achieve the asserted compelling state interest. *See Students*

---

[3] Diemert also alleges he was invited to attend a discussion on "white racial literacy" and a discussion about an article entitled "White People Are Cowards." Dkt. No. 11 at 13. The Court cannot discern from the complaint whether this conduct falls within the statute of limitations period.

*for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2162 (2023). The Court finds further factual development is necessary regarding the City's affinity group policy and whether it caused Diemert a constitutional injury.

Accordingly, Diemert has stated a plausible equal protection claim.

## V.        Diemert has stated a plausible claim of retaliation.

Diemert alleges that the City retaliated against him after he engaged in protected activity. To establish a prima facie case of retaliation, a plaintiff must show that (1) they participated in a protected activity; (2) they suffered an adverse employment action; and (3) a causal link exits between the protected activity and the employer's adverse action. *Nilsson v. City of Mesa*, 503 F.3d 947, 954 (9th Cir. 2007) (Title VII); *Tyner v. State*, 154 P.3d 920, 928 (2007) (WLAD). A retaliation claim "need not be supported by an adverse action that materially altered the terms or conditions of the plaintiff's employment" instead a plaintiff must allege that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018).

Diemert claims his supervisor retaliated against him for filing an EEOC charge and because he "voiced his objections to the City's RSJI on numerous occasions." Specifically, Diemert alleges his supervisor called him out when he asked why the public email inbox was not being checked by saying, "how many applications does [Diemert] have sitting in the drawer . . . what is the oldest date of his applications and delays?" Dkt. No. 11 at 24.

Diemert also alleges that his supervisor cancelled their regular meetings and that the HR department denied his FMLA request for a reduced work schedule and leave for biannual medical treatment in 2021. Dkt. No. 11 at 24. Although the facts alleged are unclear, it appears

the FMLA denial occurred sometime around May 2021, or around five months after Diemert filed his EEOC charge. *See id.* at 25.

The City argues Diemert's EEOC filings are not "protected activities" because he did not complain about conduct that could reasonably be perceived as illegal discrimination. The City cites *Clark Cnty. Sch. Dist. v. Breenden*, 532 U.S. 268, 271 (2001), in support of this proposition, but it is distinguishable. There, the plaintiff complained about one isolated incident in which her coworker made a mild innuendo. Here, Diemert complained of several instances of perceived harassment. The Court cannot determine at this stage of the proceeding that Diemert proceeded in bad faith.

Because the FMLA decision allegedly occurred within five months of Diemert's EEOC complaint he has plead a causal nexus sufficient to satisfy the minimal threshold required to withstand a motion to dismiss. Although Diemert has stated a plausible retaliation claim, not all acts of alleged retaliation are timely. *See infra* Section VI.

**VI.    It is too late for Diemert to seek relief for some of the City's alleged discrete acts of disparate treatment and retaliation.**

The City challenges many of Diemert's allegations as untimely. Dkt. No. 19-1 at 20. If the allegations in the complaint "show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim…." *Jones v. Bock*, 549 U.S. 199, 215 (2007).

To bring a claim under Title VII, a Washington employee must file a charge with the EEOC within 300 days of the alleged unlawful occurrence. 42 U.S.C. § 2000e-5(e)(1). The statute of limitations under the WLAD is three years. *Antonius v. King Cnty.*, 103 P.3d 729, 732 (Wash. 2004) (citing RCW § 4.16.080(2)). For discrete acts—acts that "'occurred" on the day that it 'happened'"—the statute of limitations period begins to run from the date of alleged

wrongful act. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002); *Antonius,* 103 P.3d at 733. Claims involving denial of promotion, transfers, demotions, unfavorable job assignments, warning letters, poor performance evaluations, or failure to hire are easily identifiable as discrete acts. *See* B. Lindemann & P. Grossman, Employment Discrimination Law § 27.II.B.3.b. (6th ed. 2020) (collecting cases). But hostile work environment claims, "are different in kind from discrete acts," as "[t]heir very nature involves repeated conduct" that "occurs over a series of days or perhaps years" and "are based on the cumulative effect of individual acts;" "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 115, 117 (quoting 42 U.S.C. § 2000e-5(e)(1)).

Even under the liberal pleading standard, Diemert does not plead facts showing the potential applicability of the equitable tolling or other waiver doctrines. *See Cervantes v. City of San Diego,* 5 F.3d 1273, 1277 (9th Cir. 1993). Thus, because Diemert filed his initial EEOC charge on December 23, 2020, only alleged unlawful acts occurring on or after February 27, 2020, are timely under Title VII unless they are premised upon an ongoing hostile-work environment. Along the same lines, Diemert filed his complaint on November 16, 2022, so the oldest discrete act his WLAD claims could reach would have occurred on or after November 16, 2019.

Accordingly, the City's motion to dismiss is GRANTED in part and DENIED in part, and Diemert's causes of action under Title VII for disparate treatment on the basis of race (Count III) and retaliation (Count IV) are DISMISSED without prejudice to the extent they are based on discrete acts occurring before February 27, 2020.

Similarly, the City's motion to dismiss is GRANTED in part and DENIED in part, and Diemert's causes of action under the WLAD for disparate treatment on the basis of race (Count

V) and retaliation (Count VII) are DISMISSED without prejudice to the extent they are based on discrete acts occurring before November 16, 2019.

A three-year statute of limitations applies to Diemert's Equal Protection Claim. *See RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002) (citing RCW § 4.16.080(2)). But given the on-going nature of the alleged violation, the Court declines to limit the scope of Diemert's Equal Protection claim at this time.

## VII.    Defendant's Exhibits.

The City attaches several documents to its motion to dismiss, including various emails Diemert sent to his colleagues. *See* Dkt. No. 16-1–16-5. It argues the Court may consider these emails without converting its motion to a motion for summary judgment because Diemert references the emails in his complaint. Dkt. No. 19-1 at 8 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)). Courts may incorporate-by-reference a document into the complaint if the plaintiff refers extensively to the document or if the document forms the basis of the plaintiff's claims. *Khoja*, 899 F.3d at 1002. That is not the scenario here. Diemert does not refer extensively to the emails selected by the City. Therefore, the Court makes its decision without considering the attachments to the City's motion to dismiss.

## CONCLUSION

Accordingly, the Court GRANTS in part and DENIES in part the City's motion to dismiss. Diemert's Title VII disparate treatment claim (Count III) and retaliation claim (Count VII) are DISMISSED without prejudice to the extent they arise out of discrete acts occurring before February 27, 2020. Diemert's WLAD disparate treatment claim (Count V) and retaliation claim (Count VII) are DISMISSED without prejudice to the extent they arise out of discrete acts occurring before November 16, 2019. Diemert's disparate treatment and retaliation claims based on conduct within the applicable limitations periods may proceed. Diemert's hostile-work

environment claims under Title VII (Count II) and WLAD (Count VI) and equal protection claim (Count I) may also proceed.

Dated this 28th day of August, 2023.

Jamal N. Whitehead
United States District Judge