Hon. Jamal N. Whitehead

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| JOSHUA A. DIEMERT, an individual, | ) | Civil Action No. 2:22-cv-01640-JNW |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S** |
| THE CITY OF SEATTLE, a municipal corporation, | ) ) ) | **MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | ) ) ) | **Noted on motion calendar Sept. 13, 2024** |
| | ) ) | **Oral Argument Requested** |

## I.    <u>INTRODUCTION</u>

The official policy of the City of Seattle is to infuse race into ***all*** City functions. This race-first policy has, unsurprisingly, resulted in a workplace where an individual's race is their defining characteristic. This lawsuit is the foreseeable result of that policy. It is being waged by one brave individual who finally had enough of being reduced to an embodiment of his race. He brings both constitutional and civil rights challenges to the hostile workplace that Seattle's policy fostered. Overwhelming documentation reveals the City's Human Services Department (HSD) to be a hostile work environment rife with division, racial stereotyping, and complaints of discrimination.

*Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484*

Plaintiff Joshua Diemert served Seattle's vulnerable and disadvantaged communities as a Program Intake Representative within HSD from 2013 to 2021. He enjoyed this job and the opportunity to serve his clients, noting that "I am here to serve my clients…my attitude towards positive change is one of enthusiasm, and I consistently put forth an effort to improve myself and my surroundings." D'Agostino Decl. ¶ 9, Ex. 8 p. 60.  Despite Mr. Diemert's commitment to his work and his clients, City managers, supervisors, and personnel consistently harassed him with discriminatory remarks and conduct throughout his employment. The City retaliated or ignored his concerns because of the color of his skin.

The City's motion for summary judgment claims disputed facts as "undisputed," ignores or mischaracterizes the record, and evades the clear issue before this Court—the City's discriminatory treatment of Mr. Diemert. The City's motion should be denied because there are disputed material facts and the evidence establishes a prima facie case for each of Mr. Diemert's claims.

## I.    STATEMENT OF FACTS[1]

Multiple questions of fact must be resolved by the jury as to whether Mr. Diemert experienced discrimination, disparate treatment, retaliation, and a racially hostile work environment. The City seeks to characterize various incidents as innocuous occurrences or "merely offensive utterances," but the record tells a different story—a work environment replete with hatred, conflict, and the weaponization of race. The following facts from the record are just a sample of the evidence supporting Mr. Diemert's claims.

### A.  Mr. Diemert Experienced Severe Racial Harassment and Discrimination Throughout His Employment

City employees made racially demeaning comments against white people with such regularity and incorporated them into so many different facets of the City, that it was a near-daily occurrence for Mr. Diemert to hear some pejorative trait about his racial identity as a white man. D'Agostino Decl. ¶ 24, Ex. 23; Diemert Dep. Vol. 1 at 100:4–21; Diemert Decl. ¶¶ 22–24. HSD

---

[1] Throughout its motion, the City makes repeated references to "undisputed facts" which are actually facts disputed by Plaintiff. Each will be identified and addressed.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

was an especially racially toxic work environment. It was normal for employees to refer to a white coworker as a "stupid white bitch," or for a manager to forward an employee biography that contained a preference for that employee to spend time with "black and brown folks." D'Agostino Decl. ¶ 35, Ex. 34 ¶11; D'Agostino Decl., ¶ 5, Ex. 4. When Mr. Diemert's supervisors repeatedly told him that it was impossible for white people to experience discrimination (D'Agostino Decl., ¶ 36, Ex. 35; Johnson Dep. 16: 10–24; Diemert Decl. ¶ 27, 32) they were putting into practice the City's Race and Social Justice Initiative (RSJI) and laying the foundation for all the racial harassment Mr. Diemert would face. Some of the incidents occurring between 2019 and 2021 include:

> i. *Shamsu Said Verbally and Physically Accosted Mr. Diemert*

Between 2019 and 2020, Shamsu Said, one of Mr. Diemert's direct supervisors, repeatedly told Mr. Diemert that because he was white, Mr. Diemert was to blame for all injustices in the United States. Diemert Decl. ¶ 47; D'Agostino Decl. ¶ 24, Ex. 23; Diemert Dep. Vol. 1 260:2– 262:3. During several of these interactions, Mr. Said would also refer to Mr. Diemert as a "colonist" and other racial stereotypes. Mr. Said and other City employees regularly referred to white employees as "colonists." *Id.*

In February 2020, Mr. Said aggressively chest bumped Mr. Diemert, got in his face, accused him of having "white privilege" after Mr. Diemert reported Mr. Said for fraudulent conduct.[2] Diemert Decl. ¶ 47. Rather than addressing Mr. Said's conduct, the City moved him a mere eight feet away from Mr. Diemert's workstation and forced Mr. Diemert to continue reporting to Mr. Said. Diemert Decl. ¶ 48; D'Agostino Decl. ¶ 24, Ex. 23; Diemert Dep. Vol. 1 293:15–23, 302:1–19.

> ii. *Discrimination and Retaliation by Supervisor Kilpatrick-Goodwill*

Ms. Kilpatrick-Goodwill told Mr. Diemert that it is impossible to be racist towards "white people," that all "white people" are racist, and that "black people" cannot be racist, echoing the

---

[2] Subsequent investigation by the City confirmed that Said engaged in fraud.

P. Response in Oppo to Mot. for Summ. J - 3
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

same racially hostile messaging disseminated in RSJI training, Diemert Decl. ¶ 32. She reiterated these same comments during several other occasions. Diemert Decl. ¶ 42, 45.[3]

When Mr. Diemert raised his concerns about the racialized training and RSJI material with Ms. Kilpatrick-Goodwill, she retaliated by not helping him resolve technological and logistical issues, as well as cancelling all his meetings. Mr. Diemert is not aware of any other employee in HSD under Kilpatrick-Goodwill's supervision that had all their meetings with her canceled. Diemert Decl. ¶ 49.

In January 2021, Ms. Kilpatrick-Goodwill further retaliated against Mr. Diemert for filing his EEOC charge on December 23, 2020, and because he had voiced his objections to the City RSJI on numerous occasions, subjecting him to scrutiny which no similarly situated coworker was subjected. D'Agostino Decl. ¶ 14, Ex. 13. Both John Fields and Rose Long, recognized Ms. Kilpatrick's retaliatory behavior.

      *iii.   Racially Derogatory Comments During Trainings & Workplace Discussions*

In order to fulfill his RSJI training in 2019, Mr. Diemert was required to attend a two-day "Undoing Institutional Racism" (UIR) workshop. Diemert Decl. ¶ 39. This was taught by the People's Institute for Survival and Beyond (PISAB). D'Agostino Decl. ¶ 40, Ex. 39; Sharkey 30(b)(6) Dep. 44:2–12. The City has a partnership with PISAB that extends back decades, and it has adopted PISAB's "anti-racist" principles as part of its RSJI. *Id.* at 41:7 to 42:9. It was at this training that the facilitators stated that "white people are like the devil," that "racism is in white people's DNA," and that "white people are cannibals." Diemert Decl. ¶ 42; D'Agostino Decl. ¶ 24, Ex. 23; Diemert Dep. Vol. 1 207:1–213:2.[4] When Mr. Diemert objected, the facilitators used their platform to belittle and attack him. Other coworkers that were present continued mocking Mr. Diemert. and called him a "white supremacist." *Id.*

---

[3] Ms. Kilpatrick-Goodwill also participated in group chats where participants verbalized negative racial stereotypes about white people. D'Agostino Decl. ¶ 25, Ex. 24; Kilpatrick Dep. Ex. 1.

[4] Another white employee reports that between 2017 and 2018, there were several "Undoing Institutional Racism" trainings promoted by HSD that discriminated against and degraded white employees. D'Agostino Decl. ¶ 35, Ex. 34 ¶ 21.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Similarly, Mr. Diemert was also subject to racially demeaning comments from Race and Social Justice Lead, Edward Odom. Diemert Decl. ¶ 46; D'Agostino Decl. ¶ 41, Ex. 40. Mr. Odom also spoke with other City employees about his communications with Mr. Diemert, two of whom had an extensive discussion about Mr. Diemert, referring to him as "some asshole," as someone who would "just come back with more stupidity," and the "reincarnation of the people that shot native americans from trains" that someone should "just get a guy to swing by when Josh is in the restroom and beat him bloody." D'Agostino Decl. ¶ 42, Ex. 41. Another employee write that he wanted to write on SharePoint, "Josh, I will cut your nuts off for fun." *Id.*

### i.    *The City Denied Mr. Diemert's Request to Start a Non-racial Affinity Group*

In July 2021, Mr. Diemert proposed the creation of a non-racial affinity group that opposes stereotyping. Diemert. Decl. ¶ 51; D'Agostino Decl. ¶ 15, Ex. 14. But Mr. Groce told him that "City-sponsored workgroups, including the creation of affinity groups…would need to support the City's Race and Social Justice Initiative," that "HSD staff are also required to support the goals" of the RSJI, and would require HSD Change Team approval. Diemert. Decl. ¶ 51. Given that these change teams operate to implement RSJI within each City department by "supporting development and implementation of the department's annual RSJI Work Plan," Mr. Diemert knew it was futile to even try to submit a proposal and that his efforts would only provoke additional racial harassment. Diemert Decl. ¶ 52; D'Agostino Decl. ¶ 27, Ex. 27; McLellan Dep. 34:1–5 (Apr. 17, 2024).

### ii.    *The City's Investigation was Intentionally Narrow, Incomplete, and Biased*

Despite having complained about racial harassment and discrimination for years to HR, managers, directors, and other coworkers, Mr. Diemert's concerns were not addressed or investigated.[5] Diemert Decl. ¶ 25; D'Agostino Decl. ¶ 4, Ex. 4; ¶ 8, Ex. 7. Having found no relief from the City and continuing to regularly experience a racially hostile work environment as well as retaliation, Mr. Diemert was finally compelled to file a charge with the EEOC in December 2020. After Mr. Diemert filed the charge, Mr. Kuykendall, a City employee with the Human

---

[5] With respect to the issue of Said committing fraud, the City went out of its way to protect Said and try to classify his violation as "minor."

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Resources Investigation Unit (HRIU), was tasked with investigating Mr. Diemert's complaints. D'Agostino Decl. ¶ 18, Ex. 17. Mr. Kuykendall was in no way an objective investigator—he was an active volunteer and member of a Change Team—the very entity that supports the development and implementation of annual RSJI Work Plans. Diemert Decl. ¶ 56; D'Agostino Decl. ¶ 18, Ex. 17. The City ignored Mr. Diemert's concerns about Mr. Kuykendall's bias. *Id.*

Christy Kuna also investigated a portion of Mr. Diemert's complaints, but she also participated in a change team and affinity groups. Mr. Diemert's concerns subsequently went unaddressed again. D'Agostino Decl. ¶ 39, Ex. 38; Diemert Dep Vol. 2 513:11–514:4.

As the investigation ensued, Mr. Diemert's concerns about Kuykendall were substantiated. Kuykendall was never interested in Mr. Diemert's complaints, nor did he attempt to gather information from Mr. Diemert in an efficient way that minimized harm to Mr. Diemert professionally and emotionally. Diemert Decl. ¶ 57. Mr. Diemert's was also concerned that the City would use the information he provided to destroy evidence and cover its tracks. D'Agostino Decl. ¶ 39, Ex. 38; Diemert Dep Vol. 2 510:3 –511:7. Nonetheless, Mr. Diemert provided extensive information to Kuykendall, including complaints that were not solely about RSJI trainings. Diemert Decl. 55–59.[6] Kuykendall's investigation notes also demonstrate a bias against Mr. Diemert based on his race. In them, he states that Van Eyk, Mr. Diemert's union representative, communicated with him as "another white guy." D Response to P RFA No. 10.

It was also alarming that despite the final HRIU Report being dated August 18, 2021, Ms. Sy notes in a May 10, 2021, email that she consulted with Mr. Kuykendall and that Mr. Diemert's case was closed as of April 1st of that year. Kuykendall Dep. Ex. 10. In addition to this, Kuykendall also looked for opportunities to further narrow the scope of the investigation. Diemert Decl. ¶ 57.

***Christy Kuna's Portion of the Investigation***

Mr. Diemert does not recall being contacted by Kuna at any time during her investigation. D'Agostino Decl. ¶ 39, Ex. 38 Diemert Dep. 513:11–514:4. Kuna also improperly limited her

---

[6] The City references a March 2021 Twitter message Mr. Diemert sent to Chris Rufo. However, Mr. Diemert provided extensive information to Kuykendall after March 2021. Moreover, because Mr. Diemert did not always agree with Mr. Rufo's approaches in disclosing information, he did not provide complete updates to Mr. Rufo.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

investigation—she focused on Mr. Diemert's Cornerstone trainings (when RSJI training is also incorporated in meetings, summits, and other events not reflected in the Cornerstone system), a narrow portion of Office of Civil Rights trainings, and she missed relevant materials drafted by the people she interviewed.

**B. Mr. Diemert Experienced Severe Racial Harassment and Discrimination in the Years Prior to filing his EEOC Charges**

i.   *Employee Comments Made to Mr. Diemert*

From being asked by a manager "what could a straight white male possible offer our department?" to being told by a former division director and several supervisors that "all white people" have "white privilege" and cannot experience racism, Mr. Diemert was constantly subjected to racially hostile conduct and speech. Diemert Dep. 159:4–11; Johnson Dep. 16: 10–24. Diemert Dep. 175:7–16 (Consuelo Crow told Mr. Diemert that "white people" are to be blamed for "all atrocities" among other comments).[7] When Mr. Diemert did try to correct discriminatory behavior in the workplace, he was reprimanded by his supervisors because "it was impossible to be racist towards white people." Nothing was done to hold any of Mr. Diemert's supervisors or subordinate Sabrina Budner accountable. Diemert Dep. 172:14–25 to 173:1–5 (Mar. 23, 2024); Diemert Decl. ¶ 27.

ii.   *Mr. Diemert was Coerced to Resign from a "Lead" Position Because of His Race*

When Mr. Diemert was serving in a "lead" position in HSD in 2016, he was managing a chronic medical issue and taking FMLA leave around this time. In or around April of 2017, Supervisor Tina Inay refused to give Mr. Diemert any assistance, telling him that he should be a "team player" and step down. When he refused, Inay harassed Mr. Diemert daily and told him that he was using his "white privilege" to stay in that position and that Mr. Diemert was preventing a "BIPOC" from being promoted. After Inay's relentless racial harassment, and Mr. Diemert's health suffering, he resigned from his lead role. Diemert Dep. Vol. 1 119: 3–25, 134:16–25 to

---

[7] Ms. Crow also made racially discriminatory comments against white people in conversations with coworkers.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

135:1–8. When Mr. Diemert reported this, Sharkey appeared to support Inay's racial views. Diemert Decl._____

## C. The Race and Social Justice Initiative Created a Toxic Work Environment Replete with Employee Accounts of Discrimination

The factual record is clear—the Human Services Department was replete with complaints of discrimination, employees being denied access to trainings because of their race, and racially discriminatory conduct abounding throughout the entirety of Mr. Diemert's employment. D'Agostino Decl. ¶ 37, Ex. 36.

## II.    SUMMARY JUDGMENT IS RARELY APPROPRIATE IN EMPLOYMENT DISCRIMINATION CASES

Summary judgment is only appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In determining whether a genuine dispute of material fact exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *St. Marie v. Jefferson Cnty.*, No. 3:22-CV-05893-DGE, 2024 WL 3992633, at *4 (W.D. Wash. Aug. 29, 2024) (citing *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017)).

There is a high standard for the granting of summary judgment in employment discrimination cases. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Such motions must be "carefully examined in order to zealously guard an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *Liggett v. Wash. State Univ.*, No. C13-5176 RJB, 2014 WL 793150, at *5 (W.D. Wash. Feb. 26, 2014) (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004)). A plaintiff in an employment discrimination action "need produce very little evidence in order to overcome an employer's motion for summary

P. Response in Oppo to Mot. for Summ. J - 8
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

judgment" because the ultimate question is one that can only be resolved through "a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Chuang v. Univ. of Cali. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000) (citing *Schnidrig* 80 F.3d at 1410).

## III.    ARGUMENT

The City has failed to satisfy the requirements of summary judgment as there are numerous genuine issues of material fact that require resolution by a factfinder at trial. *Anderson*, 477 U.S. at 256. Construing all such genuine issues of fact in favor of Mr. Diemert, there is sufficient evidence to allow a jury to find in his favor on each element of his claims. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–160 (1970); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). This Court should deny the City's motion and allow the jury to resolve Mr. Diemert's claims.

### A.  Mr. Diemert's Claims Are Timely

The City claims that "nearly all" Mr. Diemert's allegations are from 2017 or earlier and that these allegations should not be considered part of the same alleged unlawful practice. This is contrary to the facts and the law. Mr. Diemert's claims are timely, including allegations of conduct that occurred at the beginning of his employment. A hostile work environment is the product of a series of acts that collectively constitute an unlawful employment practice. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). If at least one act occurred within the limitations period, the entire period during which the plaintiff experienced a hostile work environment may be considered in determining liability and damages. *Id.*[8]

On December 23, 2020, Mr. Diemert filed his first EEOC charge of retaliation and discrimination on the basis of race, color, sex, and national origin. On January 16, 2021, he filed an amended charge of retaliation and discrimination on the same grounds. On June 30, 2022, Mr.

---

[8] In its August 28, 2023, Order this Court held, "Thus, because Diemert filed his initial EEOC charge on December 23, 2020, only alleged unlawful acts occurring on or after February 27, 2020, are timely under Title VII unless they are premised upon an ongoing hostile-work environment. Along the same lines, Diemert filed his complaint on November 16, 2022, so the oldest discrete act his WLAD claims could reach would have occurred on or after November 16, 2019." ECF No. 28, p. 13. The Court also noted that while a three-year statute of limitations applies to Mr. Diemert's Equal Protection Claim, "given the on-going nature of the alleged violation, the Court declines to limit the scope of Diemert's Equal Protection claim at this time." ECF No. 28, p. 14.

*Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484*

Diemert filed an updated charge with the EEOC, detailing additional, continuing acts of discrimination he experienced between December 23 and September 7, 2021. The racially hostile and demeaning conduct occurred as early as 2013, intensified throughout Mr. Diemert's employment and continued until his constructive discharge—all the while his complaints were ignored by directors, managers, and supervisors. Even if the continuing violation doctrine did not apply—and it does—Mr. Diemert experienced extensive discrimination between February 2020 and September 2021. The incidents predating this date are evidence of the continuing pattern of discriminatory and harassing conduct that defined the racially hostile work environment Mr. Diemert experienced.

**B.  Mr. Diemert Has Established a Prima Facie Case of a Hostile Work Environment**

Mr. Diemert has established a *prima facie* case of a hostile work environment based on race which requires him to show that (1) he was subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003), *as amended* (Jan. 2, 2004). "'The working environment must both subjectively and objectively be perceived as abusive.'" *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 n.6 (9th Cir. 2003) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000)).[9]

To determine whether the conduct complained of was sufficiently severe or pervasive to violate Title VII, "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," are considered. *Vasquez*, 349 F.3d at 642. The harassment "need not be so severe as to cause diagnosed psychological injury." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017)

---

[9] The WLAD's formulation of a hostile-work environment claim mirrors that of Title VII's. *Glasgow v. Georgia-Pacific Corp.*, 693 P.2d 708, 712 (Wash. 1985); *Sangster v. Albertson's, Inc.*, 991 P.2d 674, 679 (Wash. Ct. App. 2000) ("The Glasgow formulation of the elements of sexual harassment is taken from federal cases interpreting Title VII."); F*isher v. Tacoma Sch. Dist. No. 10*, 769 P.2d 318, 320 (Wash. Ct. App. 1989) (holding the hostile-work environment standard in Glasgow applied to race-based hostile work environment claims).

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

1    (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Harris v. Forklift Sys., Inc.*, 510

2    U.S. 17, 22 (1993).

3         The City concedes that the conduct Mr. Diemert experienced was unwelcome and that he

4    subjectively found it abusive. *See* Response to P. RFA No. 13; Wise Exp. Rep. 12, 29.[10] It instead

5    contends that RSJI trainings and messaging do not constitute harassment, that the discriminatory

6    statements made to Mr. Diemert were either time-barred or mere "offensive utterances," that a

7    reasonable person would not find offensive, and that the City is not liable because it investigated

8    Mr. Diemert's claims. The City is wrong on each of these points.

9    *1.  The City's Reference to Other Diversity Trainings is Irrelevant*

10        Contrary to the City's contention, whether DEI trainings **outside** the City have value, are

11   compliant with Title VII and the Constitution, or are "widely accepted" is immaterial. Whether the

12   *City's RSJI* possesses these characteristics is key—and it does not.[11]

13        The City designed RSJI as a policy and system that would "lead with race," "center People

14   of Color," "de-center whiteness," and "prioritize the leadership of Black, Indigenous, and People

15   of Color." *See* Exhibit 8 of Amended Complaint. It is enforced and applied across **all** City

16   departments—RSJI messaging is found not only in trainings, daily meetings, and summits, and

17   daily conversations among employees, but there are change teams and other structures within the

18   City tasked with developing RSJI work plans to ensure each department is meeting RSJI

19   objectives. RSJI applies to all City employees—but *how* an employee relates to and is treated under

20   the RSJI framework changes based on the employee's racial identity.[12]

21        The City's RSJI resulted in an environment where "BIPOC" employees demanded the

22   exclusion of white employees from their training spaces (CoS_019149–019154, 019185), where

23   directors were encouraged and did use race in employment decisions, allowed Mr. Diemert to be

24   physically accosted while being subjected to racially derogatory comments (which aligned with

---

[10] There is also extensive evidence detailing how Mr. Diemert viewed his work environment as abusive and discriminatory.

[11] Even the City's own "expert" acknowledges that there are aspects of RSJI that he would do differently.

[12] The City continues to ignore this critical distinction when describing RSJI to this Court.

P. Response in Oppo to Mot. for Summ. J - 11
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

RSJI messaging) without the offending employee facing any discipline, one in which the City made no serious attempts to investigate Mr. Diemert's complaints of discrimination, and one which normalized anti-white discussions. The record is silent on any attempt by City directors, managers, trainers and employees to address the anti-white animus that permeated throughout the City and particularly within the Human Services Department.

       *i.*      *Mr. Diemert was Subjected to Insults and Harassment Because of His Race*

The City's policy subjected Mr. Diemert to anti-white insults, jokes, and harassing conduct throughout the entirety of his employment—stemming from the City's implementation of RSJI across all City departments. This is unsurprising given that all of Mr. Diemert's supervisors or employees he reported his concerns to were part of a change team, affinity group, or otherwise had an interest in furthering the implementation of RSJI

       *ii.*     *There is Sufficient Evidence for a Jury to Find that the City Subjected Mr. Diemert to Discriminatory Conduct that was Severe or Pervasive*

The City seeks to mischaracterize Mr. Diemert's claims as objections to diversity trainings and "offensive utterances"—mirroring the dismissive attitude Mr. Diemert endured from his supervisors and the City's HR personnel for 8 years. *First*, the City continues to refer to Mr. Diemert's "official record" of trainings in an attempt to limit the pervasiveness of RSJI messaging. But RSJI concepts and messaging are incorporated *in nearly every* department meeting, summit, and the work Mr. Diemert was responsible for completing.[13] Everything Mr. Diemert experienced—coercion to resign, denied backpay, ignored complaints, threatening communications behind his back, physical and verbal intimidation from his supervisors, and daily bombardment with anti-white training materials and commentary are no mere "offensive utterances"—these events are all part of an ongoing pattern of discrimination that caused Mr. Diemert stress, anxiety, and to seek counseling.

In support of its arguments against this element, the City cites to *Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 890 (S.D. Ohio 2002), *aff'd*, 97 F. App'x 634 (6th Cir. 2004) and *Sanchez v.*

---

[13] The City's assertion that the "last official" training Mr. Diemert took in 2019 is misleading because he was required to continue participating in RSJI-infused activities and trainings within his department meetings and work.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

*City of Santa Ana*—neither are applicable to the type of work environment Mr. Diemert experienced. Neither the environment described in *Vitt* nor in *Sanchez* deals with the implementation of a system that "centers race" like RSJI. Second, the specific incidents described in both cases are far narrower in scope and frequency than the conduct Mr. Diemert endured.

It is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). "We have held that such hostility need not be directly targeted at the plaintiff to be relevant to his or her hostile work environment claim." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 688 (9th Cir. 2017) (citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1117 (9th Cir. 2004). By September 2021, the City's relentless harassment and discrimination had worn Mr. Diemert down, to the point that he could no longer remain at a job that he had found meaningful.

### iii.    Mr. Diemert's Work Environment was Objectively Hostile

The City claims that a reasonable person would not find it offensive to be exposed to RSJI materials or to the conduct and statements Mr. Diemert endured from his coworkers—again, the City ignores significant portions of the record. "As to the objective inquiry, we assess whether the workplace was hostile from the perspective of a reasonable person belonging to the plaintiff's racial or ethnic group..." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017). Jennifer Yost, a former HSD employee, also experienced a racially hostile work environment and was offended by the anti-white comments and RSJI training and materials. D'Agostino Decl. ¶35, Ex. 34.. These incidents at the very least raise a factual issue about whether the City maintained an objective hostile work environment.

### iv.    The City is Liable for the Hostile Work Environment Created by its Supervisors

The City failed to take adequate remedial action to eliminate the hostile work environment that harassing supervisors and employees created—it is liable vicariously and through negligence. An employer may be held liable for creating a hostile work environment either vicariously (i.e., through the acts of a supervisor) or through negligence (i.e., failing to correct or prevent discriminatory conduct by an employee). *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 688

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

(9th Cir. 2017); *Fried v. Wynn Las Vegas*, 18 F.4th 643, 648 (9th Cir. 2021) ("An employer can create a hostile work environment by failing to take immediate and corrective action in response to a coworker's [harassment or discrimination] the employer knew or should have known about."). The HRIU investigation came about only because Mr. Diemert filed an EEOC charge, but all his complaints to Brian Sharkey, Andi Morales, Ryan Groce, Tanya Kim, Gloria Hatcher Mays, Chaney Kilpatrick-Goodwill, and Ron Mirabueno were ignored. Based on the record, it appears that none of these City employees ever escalated Mr. Diemert's claims, complied with the City's mandatory reporting policy, or held any of the perpetrators of the discrimination responsible.[14]

## C.  Mr. Diemert Has Established a *Prima Facie* Case of an Equal Protection Violation

The record reflects direct and circumstantial evidence that the City discriminated against Mr. Diemert because of his race, denying him his constitutional right to equal protection of the laws, and precluding summary judgment.

The central inquiry in an Equal Protection Clause claim is "whether a government action was motivated by a discriminatory purpose," which may be established by direct or circumstantial evidence that a "discriminatory reason more likely than[n] not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (citing *Ave. 6E Invs., LLC v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016)). The plaintiff must show that the defendant "acted in a discriminatory manner," that the discrimination was "intentional," and that it occurred because of his membership in a protected class. *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir. 2005).

"A municipality may be held liable under § 1983 if the plaintiff proves that a government employee committed the alleged violation pursuant to a formal government policy or a 'longstanding practice or custom which constitutes the "standard operating procedure" of the local government entity.'" *Watts v. Cnty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

---

[14] The City claims that Shamsu Said was moved to a different area and that Mr. Diemert reported to another supervisor, but that is not correct. Said was moved a few feet away and Kilpatrick-Goodwill required Mr. Diemert to continue reporting to him.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

The City contends that the "undisputed facts" are that affinity groups are open to everyone, that there was no penalty for failure to attend an affinity group or the "optional" training that had a "white" session and a "POC" session, that every other element of RSJI was directed equally to all employees, and that there is no evidence of discriminatory intent. The City is wrong factually and legally.

### i.    The City Concedes that it uses Race in the Workplace

What is *undisputed* is the City's use of race as part of its RSJI. The record shows that, in practice, affinity groups and caucuses transformed into tense and uncomfortable environments for those that did not identify with the race of the given group. Moreover, even if affinity groups and caucuses were not "mandatory," employees that did not participate in these activities were penalized informally, with respect to progressing with their careers and the treatment they received from their peers. Diemert Decl. ¶36.

Moreover, whether the racially divided training can be categorized as "optional" depends on the employee's training record for the year. If an employee is out of options, has not fulfilled their RSJI requirements for the year, and other trainings are not available, then that racially segregated training becomes one that he must take to fulfill his workplace requirements. The City also commonly advertised trainings as ones geared for "white people" or "BIPOC."

Nor does it not matter what the City claims was the intent behind its race-based decisions, the City facially employs racial distinctions and therefore must satisfy strict scrutiny.

Finally, apart from these workplace realities, Mr. Diemert was required to attend at least two meetings where he was forced to segregate into the "white" group, he often felt pressured to participate in the white affinity group and would receive affinity group/caucus-related materials despite requesting to be removed from those communications, he had to sit through a training where white people were demeaned and disparaged. Diemert Decl., ¶¶23, 38, 39, 43.  All of these facts are direct evidence of discriminatory intent. At the summary judgment stage, § 1983 cases are "remarkably similar" to Title VII claims. *Federal Deposit Ins. Corp. v. Henderson,* 940 F.2d 465, 471–72 & n.14 (1991). The Ninth Circuit has held that a "single statement, such as 'dumb Mexican', is direct evidence of discriminatory animus and can create an inference of

discriminatory intent." *Monetti v. City of Seattle*, 875 F. Supp. 2d 1221, 1230 (W.D. Wash. 2012) (citing *Cordova v. State Farm Ins. Companies,* 124 F.3d 1145, 1149 (9th Cir. 1997)).

> i.     The City's Motion is Silent on the Compelling Interest Behind its Intentional Discrimination

The City appeals to the popularity of DEI trainings and its goal to create "equitable outcomes," but this is woefully inadequate to meet the demands of the Fourteenth Amendment. Intentional race discrimination violates "equal protection unless narrowly tailored to serve a compelling state interest." *Alaska v. EEOC*, 564 F.3d 1062, 1068 (9th Cir. 2009). Presently, the Supreme Court has identified only two compelling interests that permit the use of race-based government action: "remedying specific, identified instances of past discrimination…and avoiding imminent and serious risks to human safety in prisons…" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023). Neither of these interests are present here.

**D.  The City Subjected Mr. Diemert to Disparate Treatment and Retaliation Because He Experienced Adverse Actions and Was Constructively Discharged**

The City took several adverse employment actions against Mr. Diemert that were reasonably likely to deter him from complaining about racial discrimination and hostility. These actions contributed to his constructive discharge. As such, Defendant cannot defeat Mr. Diemert's claims of disparate treatment and retaliation.

> 1.     Adverse Employment Actions

A plaintiff may establish a prima facie case of disparate treatment under Title VII by showing (1) that he is a member of a protected class; (2) that he was qualified for his position and performing his job satisfactorily; (3) that he experienced an adverse employment action; and (4) that "similarly situated individuals outside [his] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Knight v. Brown*, 797 F. Supp. 2d 1107, 1125 (W.D. Wash. 2011) (*citing Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)).

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

A plaintiff may establish a prima facie Title VII retaliation claim by showing that 1) he undertook a protected activity under Title VII; 2) his employer subjected him to an adverse employment action, and 3) there is a causal link between those two events. *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003).[15]

The Ninth Circuit defines "adverse employment action" broadly and expansively. *See Fonseca v. Sysco Food Servs. of Arizona, Inc*., 374 F.3d 840, 847 (9th Cir. 2004); *O'Brien v. Josephine Cnty. Sheriff's Off*., No. 1:19-CV-01053-CL, 2024 WL 1705668, at *8 (D. Or. Jan. 9, 2024). For both disparate treatment and retaliation claims, an adverse employment action is any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity. *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007). Complaining about discrimination constitutes a protected activity. *Green v. City & Cnty. of San Francisco*, No. 17-CV-00607-TSH, 2021 WL 3810243, at *57 (N.D. Cal. Aug. 26, 2021).

Mr. Diemert suffered several adverse employment actions after persistently complaining about racial discrimination and filing his first EEO charge. The City's unfavorable treatment of Mr. Diemert's complaints of racial discrimination and harassment compared to its treatment of Mr. Odom and Mr. Said's complaints about conflicts with Mr. Diemert demonstrates adverse disparate treatment against Mr. Diemert. Diemert Decl., ¶46. Ms. McLellan was aware of Mr. Diemert's complaint about Odom's race-based harassment after she received their email exchange in June 2021, yet she did not investigate.

Similarly, Mr. Groce lacked concern for Mr. Diemert's issues with Mr. Said, but was fully attentive of and protective over Mr. Said when he made complaints about Mr. Diemert. D'Agostino Decl. ¶25, (Groce Dep.) at 124:8-128:18. Although Mr. Groce was aware of Mr. Diemert's complaint about Mr. Said making unwanted physical contact with him, Mr. Groce was more concerned with Mr. Said's complaints about Mr. Diemert's allegations of wrongdoing. *Id.* Groce felt like Mr. Said "needs to be protected or at least know that we're trying to do some damage

---

[15] A WLAD claim mirrors these elements. *Currier v. Northland Servs., Inc*., 182 Wash. App. 733, 742, 332 (2014).

P. Response in Oppo to Mot. for Summ. J - 17
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

control." D'Agostino Decl. ¶42, Ex. 41. No one in the City expressed the same level of concern for Mr. Diemert's protection at the time.

The City's indifference to Mr. Diemert's complaints was part of the City's ongoing failure and refusal to take Mr. Diemert's issues seriously—the only time it did investigate a portion of his claims was after he filed his EEOC charge, and the City organized a biased investigation into Mr. Diemert's claims. The Mayor's Executive Order also directs the City to conduct independent investigations when a complaint is filed regarding personnel within the investigation unit, but the City did not do this for Mr. Diemert. *Id*. at Ex. 31. These failures to investigate are adverse employment actions. *See Doe No. 1 v. Wynn Resorts, Ltd*., No. 19-cv-1904, 2023 WL 1782439, at *16 (D. Nev. Feb. 3, 2023).

Second, the City violated Mr. Diemert's FMLA rights by denying him FMLA leave. The Department of Labor report of July 19, 2021, was clear that the City violated Mr. Diemert's rights this way. D'Agostino Decl. ¶17, Ex. 16. It was not until the Department of Labor issued this report about the City's violation that the City took corrective action. Groce Decl. ¶ 19. Had the Department of Labor not admonished the City for its violations, it would not have issued Mr. Diemert FMLA leave. The City cannot escape Title VII liability for merely correcting its violation after it has been caught. *See Jackson v. United Parcel Serv., Inc*., 548 F.3d 1137, 1142 (8th Cir. 2008) ("[W]e do not find that rescinding a prior employment action will always shield an employer from liability. Such a broad rule would permit employers to escape Title VII liability merely by correcting their discriminatory acts after a significant amount of time has passed or only when litigation has been threatened.")

The City downplays its violation as a mere "paperwork error," Motion at 23, and Groce simply explains that Mr. Diemert's reduced work scheduled "was erroneously not designated as FMLA for a period of time," Groce Decl. ¶ 19. These conclusory statements fail to provide a legitimate, non-discriminatory reason for the City's violation of Mr. Diemert's FMLA rights following the filing of his EEO complaint. *See In re TFT-LCD (Flat Panel) Antitrust Litig*., No. M 07-1827 SI, 2012 WL 5411590, at *4 (N.D. Cal. Nov. 6, 2012) (*citing Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp*., 594 F.2d 730, 738 (9th Cir. 1979) (conclusory statements without factual

P. Response in Oppo to Mot. for Summ. J - 18
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

support are insufficient to support summary judgment). The City's violation significantly distressed Mr. Diemert and put his health at risk. D'Agostino Decl. ¶16, Ex. 15.

Third, Ms. Kilpatrick-Goodwill scrutinized Mr. Diemert's work more than his colleagues and denied him assistance to perform his work, which are adverse employment actions. *See O'Brien v. Josephine Cnty. Sheriff's Off.*, No. 1:19-CV-01053-CL, 2024 WL 1705668, at *8 (D. Or. Jan. 9, 2024). Ms. Kilpatrick-Goodwill singled Mr. Diemert out regarding delays in his application process on January 27, 2021. Slade Decl. ¶ 16, Ex. O. The City explains that Ms. Kilpatrick-Goodwill was actually trying to help Mr. Diemert in response to his request for help and looked into everyone else's files, Motion at 12. But what prompted Ms. Kilpatrick-Goodwill's scrutiny of Mr. Diemert was his inquiry and suggestion about improving the application processing for the entire department. Slade Decl. ¶ 17, Ex. P; D'Agostino Decl. ¶24, Ex. 23 (Diemert Dep. Vol. 1) at 319:3 to 322:13. Mr. Diemert raised an issue that was department-wide, but Ms. Kilpatrick chose to focus on Mr. Diemert's delays, Slade Decl. ¶ 17, Ex. O, and the City provides no other evidence that Ms. Kilpatrick actually reviewed other employees' processing times.

The City also fails to support its contention that Kilpatrick-Goodwill cancelled meetings or delayed assistance with installing software with other employees. Mr. Diemert also had to go above Kilpatrick-Goodwill and contact her manager to have his software issue resolved. *Id*. at; D'Agostino Decl. ¶24, Ex. 23 (Ex. 25 to Diemert Dep. Vol. 1) 316:19, 323:12 to 324:7. Kilpatrick-Goodwill had to approve resolution of Mr. Diemert's software issue. *Id*. at 324:4.

  2.  *The Adverse Employment Actions Were Connected to Mr. Diemert's Discrimination Complaints*

The City cannot dispute the causal connection between Mr. Diemert's complaints and its adverse employment actions. "Causation sufficient to establish the third element of the prima facie case may be inferred from ... the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Here, in addition to Mr. Diemert's prior ongoing complaints of discriminatory harassment, he filed his EEO Complaint on December 23, 2020 and amended it on January 16, 2021. Human Resources knew about Mr. Diemert's EEO complaint when it ignored the harassment issues he raised in his

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

exchange with Odom in June 2021, and when it treated Mr. Said more favorably in August 2021. Ms. Kilpatrick scrutinized Mr. Diemert's work in January 2021, did not show up to meetings with him, and failed to assist with his software issues after that. Ms. Kilpatrick-Goodwill was aware of Mr. Diemert's complaints, including his EEO complaint. D'Agostino Decl. ¶25, Ex. 24 (Kilpatrick-Goodwill Dep.) at 38:9–16.

### 3. *Mr. Diemert was Constructively Discharged*

Mr. Diemert made the reasonable decision to resign because of the hostile work environment that the City subjected him to that included the adverse employment actions that the City took in retaliation against him. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.") Whether intolerable and discriminatory working conditions would compel a reasonable person in Mr. Diemert's position to resign looks to the totality of the circumstances of those conditions. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987). While the City contends that it never transferred, disciplined, or transferred Mr. Diemert, conditions leading to a constructive discharge do not have to stem from official employer acts. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004). A continuous pattern of discriminatory treatment is an aggravating factor demonstrating constructive discharge. *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir. 2007).

The City attempts to soften the nature of its discriminatory RSJI training that partly caused Mr. Diemert to resign, suggesting that Mr. Diemert's disagreement with it was that it made him uncomfortable. The training did much more than that. The City cites *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000), to assert that uncomfortable employee training is not an adverse action. In *Brooks*, *id*. at 928, an employer required plaintiff employee that had been sexually harassed to attend group therapy sessions and discuss the harassment in front of coworkers. The court found that the sessions were not adverse actions because they were workshops designed to better inform the city's workforce of its sexual harassment policy, and it was a legitimate effort by

P. Response in Oppo to Mot. for Summ. J - 20
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

the city to deal with a traumatic workplace situation. *Id*. at 929. The City can make no claim of legitimacy with its RSJI—the numerous and repeated complaints of discrimination within the Human Services Department undoubtedly demonstrates this. D'Agostino Decl. ¶27, Ex. 26 (McLellan Dep.) at 64:20–73:4. ¶35, Ex. 34. (Yost Decl.)

The City's RSJI training sessions do not have the same legitimate educational intent nor were they implemented to deal with a traumatic workplace situation. RSJI training "set about to intentionally discriminate against white employees with RSJI Trainings designed to target the problem of their whiteness." Dkt. 63, Ex, 3 (Westhill Expert Report) at 7. Further, "the trainings were grounded in foundational texts rife with anti-white animus and anti-white stereotyping…" *Id*. at 8.

The experiences of Mr. Diemert's colleagues demonstrate the racially hostile workplace that Mr. Diemert worked in that reasonably prompted him to resign. *Johnson v. Riverside Healthcare Sys*., 534 F.3d 1116, 1123 (9th Cir. 2008) (Discriminatory conduct directed at an individual other than the plaintiff may be relevant to a hostile work environment claim); *see also Monteiro v. Tempe Union High Sch. Dist*., 158 F.3d 1022, 1033 (9th Cir. 1998) "Moreover, racist attacks need not be directed at the complainant in order to create a hostile educational environment.").

Additionally, the City's now insists that Mr. Diemert was not required to take any RSJI training that pertained to race. Groce Decl. Dkt. # 60 at ¶ 7. This was not the case at the time the City was responding to Mr. Diemert's complaints about the RSJI training. The City's draft response to the EEOC noted that it requires staff to attend at least two relevant trainings each year, noting that RSJI is a "citywide effort to end institutional racism and race-based disparities in City government." D'Agostino Decl. ¶28, Ex. 27. The City's response did not specify what the City says now, which is that an employee may complete training or events on issues other than race. It is unclear how training requirements centered around racial issues would have permitted employees to avoid any training on race, which the City now maintains is possible.

The permeation of race in every aspect of the city included Mr. Diemert's alternative work arrangements. Mr. Groce mentions that he was assisting Mr. Diemert determine an appropriate

accommodation for him since the City could not allow him to work remotely. Groce Decl. Dkt. # 60 at ¶ 22. This determination would involve race and gender equity, which according to the City's Alternative Work Arrangement Guidelines, "should be a major factor in decisionmaking processes." D'Agostino Decl. ¶33, Ex. 32; ¶26, Ex. 25 (Groce Dep.) at 134:24 to 137:18.

Race also permeated the decision to prevent Mr. Diemert from starting his own non-race-based affinity group. The City's citation to *Moranski v. Gen. Motors Corp*., 433 F.3d 537 (7th Cir. 2005), to support its contention that Mr. Diemert was not treated differently with respect to starting an affinity group is unavailing. There, plaintiff employee wanted to start a Christian affinity group, but the employer's guidelines did not approve of any religious-based affinity group. *Id*. at 538, 540. The court found that the employee was not discriminating against the employer under Title VII because the employee's guidelines did not recognize *any* group that promoted or advocated a religious position." *Id*. at 540–41. The situation is much different here, where the City accepts race-based affinity groups but not groups disclaiming race. The City does not have a blanket prohibition on any race-based affinity groups similar to the prohibition on any religious-based groups in *Moranski*.

Eventually, the long history of racial harassment and hostility that Mr. Diemert faced was unbearable, causing him to begin his exit from the City. Making plans to give oneself the option of leaving a hostile work environment does not remove the protection of Title VII. "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993).

## CONCLUSION

For the foregoing reasons, the Court should deny the City's Motion for Summary Judgment.

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

DATED:  Sept. 6, 2024.

Respectfully submitted:

PACIFIC LEGAL FOUNDATION

*s/ Laura M. D'Agostino*
LAURA M. D'AGOSTINO
Virginia Bar No. 91556 *
3100 Clarendon Blvd., Suite 1000
Arlington, Virginia 22201
Telephone: (202) 888-6881
LDAgostino@pacificlegal.org

*s/ Andrew R. Quinio*
ANDREW R. QUINIO
California Bar # 288101 *
*s/ Erin E. Wilcox*
ERIN E. WILCOX
California Bar # 337427 *
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
AQuinio@pacificlegal.org
EWilcox@pacificlegal.org

*s/ Wesley P. Hottot*
WESLEY P. HOTTOT, WSBA # 47539
1425 Broadway, #429
Seattle, Washington 98122
Telephone: (425) 576-0484
Fax: (916) 419-7747
WHottot@pacificlegal.org

*Counsel for Plaintiff*
* *Pro hac vice*

P. Response in Oppo to Mot. for Summ. J - 23
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

### CERTIFICATE OF SERVICE

I hereby certify that on Sept. 6, 2024 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Laura M. D'Agostino*
LAURA M. D'AGOSTINO
Virginia Bar No. 91556 *

*Attorney for Plaintiffs*
*\* pro hac vice*

P. Response in Oppo to Mot. for Summ. J - 24
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*