# EXHIBIT - 22


**MEMORANDUM**

Date:     October 26, 2018

To:       Natalie Gonzalez and Lupe Vidaurri, Latin X Caucus Leaders
          on behalf of members from Latin X Caucus, African Descent Caucus and Asian Pacific Islander Caucus

From:     Terry McLellan, Human Resources Director

Subject:  Response to Formal Complaint - ADS Hiring Practices

---

Human Resources (HR) received your complaint of discrimination, dated August 31, 2018. The Human Services Department takes complaints of discrimination very seriously; allegations of harassment and discrimination are always investigated. As such, Human Resources investigated all allegations presented in your complaint, and we completed our investigation on October 12, 2018.

I met with you and other Caucus leadership on October 15, 2018 to share HR's investigatory findings. I also shared these findings with ADS supervisors on October 18, 2018. Both work groups asked for a written summary which I agreed to provide. Below is a written summary of HR's investigatory findings.

## **ALLEGATIONS**

Latin X Caucus alleges that the Aging and Disability Services (ADS) Division has inequitable hiring practices that negatively impact People of Color. In particular, Latin X Caucus alleges:

   a. Opportunities for staff (i.e. People of Color) to apply for Out-of-Classification (OOC) opportunities have been restricted or not granted.

   b. Positions are created and not granted to candidates with no transparent hiring process.

   c. Opportunities have been taken away from People of Color.

Latin X Caucus provided the following examples as evidence to support the foregoing allegations:

**Example 1:** Out of Classification – Human Services Program Supervisor *IP Specialist Supervisor* (closing date, October 24, 2017) - Offered to a white male who would knowingly go on paternity leave during the OOC time. There was no opportunity to fill it while he was gone and instead, a senior supervisor took over the work duties.

**Example 2**: Out of Classification - Manager 2 – Case Management (closing date, April 17, 2018) - ADS hired two program managers (each for a 6-month term) instead of one program manager (for a year long term) as was originally advertised. Those selected were both white individuals.

**Example 3:** Human Services Program Supervisor Sr. (closing date, August 14, 2018) - two permanent Sr. Supervisor positions and two OOC assignments.

**Example 3a:**  It was also noticed that the IP Specialist Supervisor changed from a regular supervisor to a senior supervisor.  This changed the qualifications of the position and was not equitable to the other Sr. Supervisors.

**Example 3b**: Also, in this process it was mentioned that all qualifying people would get be interviewed, yet some people of color did not or had to reach out to Human Resources and ask why.

**Example 4:**  OOC selection in general: There were <u>many times</u> when some individuals of color were not allowed to participate in an OOC while other white counterparts were allowed.

## FACT-FINDING

Human Resources investigated each allegation to determine if ADS's hiring practices discriminated against People of Color.

**Example 1:**  *Out of Classification – Human Services Program Supervisor IP Specialist Supervisor (closing date, October 24, 2017) – This opportunity was offered to a White male who would knowingly go on paternity leave during the OOC time. There was no opportunity to fill it while he was gone and instead, a senior supervisor took over the work duties.*

<u>Fact-finding</u>

- The IP Specialist Supervisor OOC opportunity was advertised to all ADS employees.

- Three People of Color, two White employees and a part-Hispanic male who identifies as White were interviewed.

- The top candidate was an expectant father and is part-Hispanic who identifies as White.  The top candidate demonstrated social service supervisory experience and project management skills needed to perform the body of work, relative to other candidates.

- ADS knew that the top candidate selected for the OOC opportunity would eventually be on FML/paternity leave; however, it would've been illegal for ADS to deny the top candidate a job offer based on an employee's projected FML status.  As such, ADS selected the individual for the OOC assignment.

- When the employee went on paternity leave, an existing Sr. Supervisor agreed to absorb the OOC IP Supervisor's body of work.  ADS agreed to the interim arrangement so there wasn't a need to generate an OOC hiring process.

<u>Final assessment</u>

- There was no evidence of racial discrimination.

- People of Color were not denied access to apply for this OOC opportunity.  ADS employees had equal opportunity to apply.

- The top candidate selected for the IP Supervisor OOC opportunity is a part-Hispanic male with four years of supervisory and project management experience in a social service setting.  Other non-White candidates didn't possess, nor did they demonstrate comparable supervisory and project management experience and skills when interviewed.

- ADS could not deny the top-candidate the OOC opportunity based on the employee's future FML status.

- ADS had a legitimate reason for not re-posting the IP Supervisor OOC opportunity for the duration of the employee's paternity leave.  A Sr. Supervisor volunteered to absorb the IP Supervisor's body of work on an intermittent, short-term basis.

   It's also important to note that the City isn't required to generate or re-generate an OOC hiring process when an employee is on a leave of absence.  City managers have full discretion to assign or reassign work based on need, including the need for an OOC assignment.


**Example 2:  *Out of Classification - Manager 2 – Case Management (closing date, April 17, 2018) - ADS hired two program managers (each for a 6-month term) instead of one program manager (for a year long term) as was originally advertised. Those selected were both white individuals.***

Fact-finding

- The Manager 2 – Case Management OOC opportunity was announced to all ADS employees.

- Three White and one Person of Color applied for the OOC opportunity and were interviewed – two ADS Sr. Supervisors (White), one YFE Manager (White) and one ADS Counselor (Person of Color).

- The two top-candidates selected for the OOC opportunity were Sr. Supervisors from ADS.  Both candidates are White and demonstrated equal supervisory and case management experience and skill throughout the interview.  Other candidates who interviewed weren't as competitive.

    o  The Person of Color who interviewed was a Counselor in ADS with minimal supervisory experience.  The other candidate (White) who interviewed had no ADS case management experience.

- There were two equally qualified candidates.  ADS decided to provide the OOC opportunity to both candidates as a learning opportunity instead of limiting it to one individual.   HR supported ADS's decision.


Final assessment

- There was no evidence of racial discrimination.

- People of Color were not denied access to apply for this OOC opportunity.  ADS employees had equal opportunity to apply.

HSD_C145313_01_102537

- The two top candidates were seasoned ADS Sr. Supervisors in case management.  Other candidates weren't as competitive.  The person of color didn't hold comparable supervisory experience, and the other candidate didn't have ADS case management experience.

- ADS's decision to split the one-year OOC assignment into two six-month assignments was not discriminatory.  ADS's reasons for doing so was based on providing the OOC opportunity to two top candidates of equal standing, regardless of race.

**Example 3:**  *Human Services Program Supervisor Sr. (closing date, August 14, 2018) - two permanent Sr. Supervisor positions and two OOC assignments.*

- ADS intended to use this process to fill two permanent and two OOC Sr. Supervisor assignments. ADS wanted to avoid four hiring processes because they didn't want to require employees to apply and go through four separate hiring processes.  In the end, this process was used to fill one permanent and two OOC Sr. Supervisor assignments.  (The hiring process for the IP Supervisor is on hold, pending classification review.)

- The Sr. Supervisor job opportunity and OOC opportunity was announced to all ADS employees.

- Five People of Color and six White employees advanced to second (final) interviews.

- The two top-candidates were deemed equally qualified by the hiring panel – a Person of Color and a part-Hispanic male who identifies as White.  The third top-scoring candidate was also a Person of Color.

- ADS made their final hiring decision for the permanent job opportunity based on work location, not race. The permanent Sr. Supervisor assignment is in Seattle.  The Person of Color indicated that she wanted to remain in Renton and didn't want to work in Seattle.  The other top candidate agreed to work in Seattle and accepted the permanent position.

- Two People of Color were selected for the remaining OOC assignments.

<u>Final assessment</u>

- There was no evidence of racial discrimination.

- People of Color were not denied access to apply for this OOC opportunity.  ADS employees had equal opportunity to apply.

- The three applicants selected for these opportunities were People of Color or of mixed-Ethnicity.

- ADS's hiring decision for the permanent position was based on the need to work in Seattle, not based on Race.

**Example 3a:**  *It was also noticed that the IP Specialist Supervisor changed from a regular supervisor to a senior supervisor.  This changed the qualifications of the position and was not equitable to the other Sr. Supervisors.*

- HR learned that the OOC IP Supervisor wasn't performing the full-scope of work required of the permanent IP Supervisor.  Higher-level duties and responsibilities are being reallocated to the permanent IP Supervisor and ADS believed that the correct classification is Sr. Supervisor.

- A few employees and Local 17 raised concerns about position classifications for 1) the OOC IP Supervisor, and 2) the permanent IP Sr. Supervisor.  HR saw potential concerns as well.  As such, the hiring process for the permanent IP Sr. Supervisor is on hold until accurate job classifications are determined by the Seattle Department of Human Resources (SDHR).  Job descriptions/Position Description Questionnaire's (PDQ) are currently under review by SDHR.

- In partnership with Local 17, ADS agreed to the following:

    - The employee assigned in the current OOC IP Supervisor assignment will be compensated appropriately.

    - If SDHR determines that the IP Supervisor classification is a Sr. Supervisor, then ADS will reach out to existing ADS Sr. Supervisors to see if anyone is interested in a reassignment prior to generating a formal hiring process.

    - If SDHR determines that the IP Supervisor classification is something other than a Sr. Supervisor, then ADS will generate a hiring process under the correct position classification.

Final assessment

- Although there was no evidence of racial discrimination, ADS should have had the permanent IP Sr. Supervisor's body of work reviewed for appropriate classification prior to positing.  Fortunately, this matter was brought to HR's attention in a timely manner and the Department took immediate action to correct the situation prior to making a hiring decision.

**Example 3b:**  *Also, in this process it was mentioned that all qualifying people would be interviewed, yet some people of color did not or had to reach out to Human Resources and ask why.*

Fact-finding

- There were two internal candidates, both People of Color, who inquired about their qualifications prior to the interview process.

- The first internal candidate didn't qualify because her supervisory experience was not in human services or social services.  Rather, her supervisory experience reflected one year in retail.

- The second internal candidate qualified after HR staff recognized his "lead" experience over HSD programs qualified as supervisory experience.  The HR staff member was new and made the oversight within her first week of employment in HSD HR.  The HR staff member acknowledged the oversight, admitted the error and corrected the situation immediately.  The internal candidate received an interview.

HSD_C145313_01_102539

Final assessment

- There was no evidence of discriminatory intent.  The first candidate didn't receive an interview because she didn't meet minimum qualifications.  The second candidate was inadvertently missed due to human error.  Once the error was realized, HR staff corrected the situation and scheduled the employee for an interview.

**Example 4:**  *OOC selection in general: There were <u>many times</u> when some individuals of color were not allowed to participate in an OOC while other white counterparts were allowed.*

There was no evidence indicating that that People of Color were not allowed to participate in ADS OOC assignments relative to other White employees.

- ADS employees had equal access to the division's OOC opportunities in 2018.  ADS was required to conduct a formal or informal hiring process for all OOC assignments.  HR implemented this expectation in 2017 to increase employee access to promotional growth opportunities.

    It's important to note that although City managers have the discretion to assign OOC work to an employee without process, following City Policy, a direct assignment in HSD is considered an "exception."  HSD managers are required to follow OOC Expectations when making exceptions to the OOC process.  (Exceptions are defined in HSD's OOC Expectation document posted on the Department's HR in-web.)

    The number of OOC direct assignments drastically decreased soon after HSD's OOC Expectations were implemented in 2017.  Prior to that, all OOC assignments less than 90 days were directly assigned without a process.  In 2018, just 1% of all OOC assignments were directly assigned, following Department's OOC Expectations.

- ADS never requested a direct-hire OOC exception in 2018.  ADS conducted hiring processes or used existing hiring processes to fill OOC assignments.  For the sake of transparency, the following incidents were also brought to HR's attention as alleged direct-hire OOC exceptions without merit:

    - Allegation: A White employee was directly assigned to perform part-time MAC/TSOA work without process.  Fact: This is false.  The employee applied for the full-time MAC/TSOA OOC opportunity but wasn't selected.  A Person of Color was selected for the full-time OOC opportunity and the White employee was offered the part-time MAC/TSOA assignment.

    - Allegation:  An employee was directly appointed to a part-time OOC Trainer assignment without process.  Fact: This is false.  The employee applied for the permanent Trainer job opportunity but wasn't selected.  Instead, a part-time OOC assignment was offered to the employee.  The employee is a Person of Color.

- Lastly, no racial disparities were noted.  In 2018, 50% of ADS's OOC opportunities were assigned to People of Color.

HSD_C145313_01_102540

**CONCLUSION**

In conclusion, Human Resources found no evidence of inequitable hiring practices in the Aging and Disability Services Division:

a. People of Color had equal opportunity to apply for Out-of-Classification (OOC) opportunities. There were no direct-assignments made in 2018. ADS conducted hiring process for all OOC opportunities in 2018. Similarly, ADS conducted hiring process for all permanent job opportunities in 2018.

b. People of Color were not restricted or granted OOC assignments compared to White employees. ADS employees had equal opportunity to apply for OOC assignments and promotional opportunities, regardless of race or any other protected class. Furthermore, 50% of all ADS OOC opportunities were assigned to People of Color in 2018.

c. Employment opportunities have not been taken away from People of Color in ADS:

   - In 2018, 47% of ADS's OOC opportunities were assigned to People of Color. The number of White employees selected for OOC decreased by 3% since 2016 (56%).

   - In 2018, 53% of ADS's permanent job opportunities went to People of Color. The number of White employees hired into permanent positions decreased by 15% since 2016 (62%).

   - In 2018, 32% of ADS's supervisory or strategic advisor opportunities went to People of Color. The number of White employees hired into such positions decreased by 16% since 2016 (84%).

   - In 2018, 65% of ADS's temporary opportunities were assigned to People of Color. The number of White candidates selected for temporary assignments decreased by 19% since 2016 (54%). Additionally, 46% of ADS's temporary workforce promoted into permanent jobs; of the 46%, 60% were People of Color.

HSD_C145313_01_102541