Hon. Jamal N. Whitehead

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| JOSHUA A. DIEMERT, an individual, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE CITY OF SEATTLE, a municipal ) <br> corporation, ) <br> ) <br> Defendant. ) <br> ) <br> ) | Civil Action No. 2:22-cv-01640-JNW <br><br> **DECLARATION OF PLAINTIFF JOSHUA A. DIEMERT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

I, Joshua Allan Diemert, declare under penalty of perjury under the laws of the United States of America and the State of Texas that the following is true and correct to the best of my present knowledge, information, and belief:

1. I am a citizen of the United States, over 18 years of age, and the Plaintiff in this matter.
2. I am a resident of Grand Saline, Texas.

**Employment Background with the City of Seattle & Job Applications**

3. From January 2013 to September 2021, I worked as a Program Intake Representative within the Human Services Department (HSD) of the City of Seattle.

Decl. Joshua Diemert re Mot. for Summ. J. - 1
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

4. During my employment with the City of Seattle, I also applied for the following jobs within the City:

- OOC Strategic Advisor 1, Utils-BU (08/23/2016)
- Utilities Assistance Supervisor (08/30/2016)[1]
- Out of Class – Senior Program Intake Representative (10/31/2016)
- Out of Class – Human Resources Business Partner (03/13/2017)
- Program Intake Representative, OOC (03/19/2017)
- Permit Specialist (05/22/2019)
- Training Coordinator (Strategic Advisor 1) (06/04/2019)
- Permit Specialist (CES, Asst) (07/16/2019)

True and accurate copies of my job applications are attached as **Exhibit 1** to D'Agostino Decl.

5. Before working for the City of Seattle, I was employed at the Washington State Department of Social and Health Services (DSHS). As a result, I usually fielded questions other City employees had about DSHS matters. I also organized interdepartmental trainings on DSHS programs among employees from City Light, Project-Share Program, Seattle Public Utilities, and other departments.

6. After I started working for the City in 2013, my workload continued to increase, but I was still required to meet the job quota of my job description. Within my first year as an employee, many coworkers would approach me with "lead-level" questions, instead of Monica Humphrey, the lead at the time. During this time, I was reviewing cases and answering questions about everything ranging from DSHS to the Utility Discount Program. I was also tasked with the design of the eligibility rules around self-employment income along with the training across departments on how self-employment income is calculated. Most of the staff outside of HSD thought I was the lead.

7. In 2014, there were communication issues between HSD IT and my department. I was asked to join a workgroup to help resolve these issues. Natalie Gonzalez was also asked to join this group. We found major issues—but I came up with a solution called the

---

[1] I withdrew this application.

Decl. Joshua Diemert re Mot. for Summ. J. - 2
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

"SLP" process which fixed the problems and streamlined the work originally requested by HSD. From that point forward, Ms. Gonzalez and I were given full authority to work in this workgroup and it was a priority for stakeholders and the Mayor's Office. I attended countless meetings in relation to this project and was still responsible for my normal work duties. Along with Ms. Gonzalez, I helped launch the program, test and re-test updates. We were responsible for training, testing, and certifying employees in the new UAP3 system.

8. In 2014, I obtained a "maximum achievement" award. This is awarded to HSD employees whose "performance and efforts have made a noticeable difference to their colleagues, the Department and/or the clients and communities" served. A true and accurate copy of the internet page with my picture and award description is attached as **Exhibit 2** to D'Agostino Decl.

9. Jason Johnson, the former division director for homelessness, told me that Ms. Gonzalez and I were the "leads" for all interdepartmental staff and the ongoing liaisons between HSD IT and any City of Seattle employee needing assistance with the newly created program. He also promised us a title change and pay increase to properly compensate us for all the new duties we were performing.

10. Relying on this communication, I assumed work responsibilities that exceeded the scope of my job title. However, despite having positive work reviews, receiving an award for my good work, and consistently complying with City policies and procedures, I never received a permanent promotion nor a substantial pay increase during my eight years as a City employee.

11. In the Spring of 2015, after working for months on implementing the Vehicle License Fee Rebate (VLFR) program under the guidance of my supervisor, Chaney Kilpatrick-Goodwill, I was asked by Gloria Hatcher-Mays to help the program launch. I worked overtime to help her launch the program and run it. I also developed the internal policies for the program. The program was supposed to have been staffed with a supervisor, two line workers, an outreach coordinator, and one administrative staff member. However,

Decl. Joshua Diemert re Mot. for Summ. J. - 3
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

Ms. Hatcher-Mays had not done the proper hiring or preparation for the program launch and I ended up being responsible for the work of all these positions and for coordinating with other City departments to make the program work. Ms. Hatcher-Mays told other departments that I was the supervisor even though I received neither the title nor the corresponding pay increase.

12. In August of 2015, Ms. Hatcher-Mays hired Iris Guzman, a person of color, as a supervisor and had me train her. Previously, Ms. Hatcher-Mays had advised me not to apply for the supervisor position because she was looking for someone who was bilingual and who had contacts within one of the marginalized communities the City was targeting. She had also noted that she was planning on expanding the Utility Discount Program supervisor role into two positions, knowing that I wanted to be considered for one of the positions. However, after hiring Ms. Guzman, Ms. Hatcher-Mays advised me that there had been a change of plans and there would no longer be a supervisory position for me to vie for. Moreover, even after hiring Ms. Guzman, Ms. Hatcher-Mays directed me to continue running the program because Ms. Guzman had no supervising experience.

13. Despite Ms. Guzman's lack of experience and involvement in the project, she still received the pay and title, even though I continued to perform substantial work. As a result of these conditions, I eventually communicated that I would no longer do anything in support of the program. Shortly after, I was ordered by Department Director Tiffany Washington to continue in the role, and I was required to work overtime on October 23, 2015, to meet with the Seattle Department of Transportation and to review and authorize an outgoing email for the VLFR program (a responsibility of the VLFR Program Supervisor, Ms. Guzman). Less than a week later, I experienced a grand mal seizure.

14. I had never had seizures before and while my doctors at the time believed this event was attributed to a previous injury, they all agreed that the catalyst was the extreme stress and anxiety I was experiencing at work.

15. On December 28, 2015, I emailed Kate Garrow, a PROTEC17 representative, regarding all these issues I was experiencing as an employee within HSD. A true and accurate copy

2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

of this email is attached as **Exhibit 3** to D'Agostino Decl. I met with Kate Garrow in May of 2015 with Brenda Sevilla-Miranda and Jacqueline Tabor who cried over the stress they had also experienced while working within HSD. Despite my meeting with Ms. Garrow and forwarding her my concerns, nothing was done to alleviate my concerns—my work conditions continued to deteriorate.

16. When I was serving in a "lead" position in HSD in 2016, I repeatedly informed my supervisors that the role of the position had changed and that the amount of work had drastically increased due to new responsibilities created from the new technology being utilized and new City programs that had been created. Despite informing my supervisors on multiple occasions that two people were needed to manage the flow of work, my recommendations were ignored—that is, until I was forced to resign from my "lead" position because of my race.

17. Around April of 2017, I was managing my medical issues and taking FMLA leave. My supervisor, Tina Inay,[2] refused to give me any assistance. She told me that I needed to be a "team player" and that I should step down because my FMLA needs conflicted with "business needs." When I refused, she began harassing me daily, pressuring me to leave my position. She told me on multiple occasions that I was using my "white privilege" to stay in that position and that because of my refusal to step down, I was preventing a "BIPOC" from being promoted.[3] I tried ignoring Ms. Inay's discrimination, but she was relentless and made my working conditions intolerable. With my own health on the line, I could not endure this level of racial harassment and stepped down from my "lead" role.

18. After I stepped down, the City filled the intermittent lead position with an employee that identified as a woman of color and who had significantly less experience than me—but I was still expected to fulfill some of my previous "lead" duties by serving as a "subject matter expert" but without the title or pay increase. The City also waited until after I had stepped down to follow my recommendation of dividing the work of the "lead" position

---

[2] It is my understanding that Ms. Inay identified herself as a "person of color."
[3] "BIPOC" is the term the City of Seattle uses, and it means "black, indigenous, persons of color."

Decl. Joshua Diemert re Mot. for Summ. J. - 5
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

between two people. Not only did the Department promote two people of color with no supervisory experience, Shamsu Said (Mr. Said) and Trinh Nguyen (Ms. Nguyen), but the Department required me to assist both leads for over a year since neither knew the program rules or how to perform the functions of their new jobs.

19. On the day I stepped down from my "lead" role, I met with Brian Sharkey, the Deputy Director of Human Resources, Finance and Administrative Services, to discuss Ms. Inay's racial harassment. However, as I relayed to Mr. Sharkey everything I had been through, it became clear that Mr. Sharkey supported Ms. Inay's racial views. Ms. Inay was never reprimanded or disciplined for this incident, nor was anything done to address the racial hostility I experienced.

20. I also experienced discrimination when I sought back pay for performing out of class work. When my supervisor Ms. Kilpatrick-Goodwill brought her back pay request to the Human Resources Department, her request was honored. When I requested back pay, I was told that while the City acknowledged that I performed out of class work, and that I could note this experience on my resume, I would have to hire a lawyer and file a lawsuit to obtain any back pay.

21. It is my belief that all of these incidents—being overburdened with work, receiving no support, experiencing harassment to resign from my "lead role," the City condoning Ms. Inay's racial harassment towards me, having my concerns ignored, the elevation of employees with less experience than me, and dismissing my attempts to obtain back pay—occurred because the City discriminated against me as a white male as it began aggressively implementing its Race and Social Justice Initiative (RSJI) into every department and City function. These incidents formed the pattern of discriminatory conduct I would continue to experience throughout the entirety of my employment with the City.

**The City's Race and Social Justice Initiative & Impact on My Work Environment**

22. As the incidents above were occurring, I began noticing that directors, managers, and supervisors increasingly began using racialized language, particularly against white

Decl. Joshua Diemert re Mot. for Summ. J. - 6
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

employees and "white people." In fact, it is difficult for me to remember every single incidence in which I heard a racially pejorative comment against white people because it was a daily occurrence in my work environment.

23. Throughout my employment, I attended trainings and meetings where I was called out and assigned characteristics and stereotyped simply because of the color of my skin. There were also times when I heard management make statements like, "'Hey, we need to focus in hiring this group of people,' or, 'Hey, you need to shut up because of your race and you should let this race or this gender speak and follow them.'"

24. I recall my supervisor's manager, Ron Mirabueno, forwarding an email to HSD Department employees wherein a new employee stated that he preferred spending time with "black and brown folks." A true and accurate copy of this email is attached as **Exhibit 4** to D'Agostino Decl. Through my public records requests, I have received communications exchanged by people who were involved in discriminating against me, like Consuelo Crow. In one chat exchange, Ms. Crow states that white mothers are "not allowed to love their children…white mothers treat their white kids like 'handbags.'" While I was not a participant in this specific conversation, I would often hear similar, anti-white statements being made at work. A true and accurate copy of this chat message I received from the City through a public record request is attached as **Exhibit 5** to D'Agostino Decl.

25. To understand the racially discriminatory behavior I experienced, it is important to understand the framework of the City's RSJI. It is a system that embeds discrimination based on identity into everything the City does—it is impossible for City employees to avoid this framework. For years I tried reporting the discrimination I witnessed but my complaints were ignored every time. I even tried to create a non-race-based affinity group, but was prevented by the City from doing so.

26. RSJI posits that race is the most important factor, and it was normal to see documents that told City employees to lead with race, "center People of Color," "de-center whiteness," that all white employees should work at undoing their "whiteness" and

Decl. Joshua Diemert re Mot. for Summ. J. - 7
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

"prioritize the leadership of Black, Indigenous, and People of Color …" A true and accurate copy of an example of the types of materials regularly disseminated within the workplace is attached as **Exhibit 6** to D'Agostino Decl.

27. RSJI isn't an "aspiration" for the City. It is a tangible framework that the City uses to design trainings that are "targeted" for specific races, to encourage participation in race-based affinity groups/caucuses, and to use race as a lens by which it views all of its employees and functions. For example, in the HSD, I often worked with vulnerable populations facing poverty and homelessness. "Centering race" as the RSJI promoted in such a context meant to stereotype and ignore marginalized and homeless white people because they still possessed "privilege." I witnessed this attitude firsthand when I caught Sabrina Budner denying an eligible white applicant for an assistance program in 2016. When I questioned Ms. Budner, she told me that she denied the applicable because he had "white privilege." I corrected her and told her she was not permitted to discriminate against applicants because of their race. Shortly after I did this, my supervising manager, Ms. Hatcher-Mays called me to her office and berated me for attempting to correct Ms. Budner. She told me that it was "impossible" to be racist toward "white people." She did not initiate any employment actions against Ms. Budner. I reported this incident to multiple managers and directors, including my HR representative, but the City took no action. I also reported this issue in a June 21, 2021, email to Ryan Groce (the Employee and Labor Relations Manager at HSD), Ms. Kilpatrick-Goodwill, and Mr. Mirabueno. A true and accurate copy of this email and other instances where I reported this incident to City management and my union representative are attached as **Exhibit 7** to D'Agostino Decl.[4]

28. Between 2015 and 2017, I regularly participated in interview panels to screen prospective City employees. I was told by Ms. Hatcher-Mays that I should specifically focus on hiring "black female refugees that speak Farsi."

---

[4] Note: I reported this incident to City management in 2016 as well. These emails are examples of me bringing these types of issues to the City's attention. I also brought up this issue during my Human Resources Investigation Unit (HRIU) investigation.

Decl. Joshua Diemert re Mot. for Summ. J. - 8
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

29. On multiple occasions, upper-level managers told me and other HSD employees that when new jobs became available, particularly in senior roles, they were looking to fill those positions with people of color and that white men should not apply. Tanya Kim, acting director of HSD, and Mr. Johnson would both encourage City employees to push job openings toward "BIPOC" communities.

30. In 2018, I even observed discriminatory attitudes in how HSD gathered data. The Department teamed up with the University of Washington to complete a disaggregation study to assess racial and ethnic subgroups that were underserved. I noticed that my Department only wanted to break down race and ethnic subgroups for non-white groups. When I asked why they were not considering doing this for white individuals as well, Department staff told me that white people are "privileged" and that there was no reason to subgroup them. I explained that there were many City clients that were extremely poor and would benefit if they were not just stereotyped as white. My department told me that this was not needed because they ultimately benefitted by living in a system of "white supremacy."

31. After the start of the pandemic, and throughout 2020 and 2021, Department leadership and co-workers openly discussed the need to carry out layoffs based on race during Department all-staff video meetings. Given one of my medical conditions, I was considered "high-risk" and was concerned about providing for my family during this chaotic time. To have to sit through meetings where high-level people in HSD enthusiastically discussed strategies for laying off white employees was absolutely humiliating—it heightened my own anxiety about my job security.

32. Throughout my employment with the City of Seattle, I was repeatedly told that it was impossible for white people to experience racism or discrimination, and that it was impossible for black people to be racist or to discriminate. I heard this statement repeated countless times throughout my employment by RSJI trainers, City coworkers, and by high-level City and HSD management and supervisors, including Mr. Johnson, Ms. Hatcher-Mays, and Ms. Kilpatrick-Goodwill.

Decl. Joshua Diemert re Mot. for Summ. J. - 9
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

33. I never heard the City communicate that "white privilege" is only an institutional concept and that there should be no animus or discrimination exhibited against white people. RSJI promoted the opposite—training opportunities and affinity groups geared towards white employees were focused on being "accountable" to City BIPOC groups and employees, and white employees continuously had to admit their own participation in the system of "white supremacy."

34. I would often hear discussions about how federal laws, like Title VII, were instruments of "white supremacy." I also recall the City's Office of Civil Rights putting out a report or document that attached federal civil rights laws because they conflict with "antiracist" RSJI work.

35. I have had the opportunity to review Jennifer Yost's declaration. While I never met her while working at HSD, all the experiences she recounts in her declaration are similar to mine and the racially hostile work environment I experienced.

**Participation in Race and Social Justice Training and Activities was Reviewed by Management as a Criteria by which Employees were Reviewed**

36. Throughout the entirety of my employment with the City of Seattle, I was evaluated by my supervisors regarding my compliance with RSJI training requirements and participation in RSJI activities. My annual reviews noted that HSD employees were required to complete certain RSJI trainings as well as "two RSJI related activities or events that increase knowledge to advance RSJI work." A true and accurate copy of my performance reviews are attached as **Exhibit 8** to D'Agostino Decl. It was my experience that every RSJI training I ended up attending would eventually mention some pejorative verbal or written comment against white people. Thus, there was no escaping exposure to racially discriminatory messaging—participation in RSJI was mandatory. I provided an extensive discussion on this issue to the EEOC in my Rebuttal to the City of Seattle's Position. A true and accurate copy of this document is attached as **Exhibit 9** to D'Agostino Decl.

Decl. Joshua Diemert re Mot. for Summ. J. - 10
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

37. In 2019, my supervisor excused me for failing to meet my requirements because I had periods of absence from work and was working part-time due to my FMLA leave. Because I was out of the office, I was unable to take the classes. When I was able to take the classes, there were none available apart from the Undoing Institutional Racism class. Between 2020 and 2021, the requirement to participate in RSJI remained, but classes were cancelled either due to COVID or the ongoing Department of Justice investigation into the City's trainings. I provided information about my racially hostile work environment to the agent tasked with investigating the City's trainings. At no time during my employment did I feel reassured that RSJI would no longer be a part of my annual evaluation. Moreover, even apart from these specific requirements, RSJI was so embedded into workplace emails, communications, and daily work life, that I was still being exposed to the discriminatory messaging from these trainings in my work environment. Additionally, I provided medical documentation from my doctor to be excused from RSJI training in 2018, but my request was ignored by the City entirely.

38. On multiple occasions between 2014 and 2020, I was forced to play "Privilege Bingo" that divisively singles out employees based on characteristics such as "Christian," "white," and "male" to identify if the employee is privileged compared with other colleagues and the clients they serve. The City believes that employees must "acknowledge" the privileges afforded to them by living in a "white supremacy culture" before they can "acknowledge the impacts of white supremacy."

39. In addition to the formal training, the City pressured me into participating in team specific RSJI training, unit RSJI-created training, department RSJI-created training, City-wide RSJI-created training, and external RSJI-created training. These would include the additional training added to summits, retreats, unit meetings, or other meetings. To receive a rating of "exceeding expectations," I was required to embrace RSJI principles and encourage others to participate in training.

40. During a required department retreat, I was forced to participate in a "racist/anti-racist continuum" line where employees were all asked to stand up and place themselves in a

Decl. Joshua Diemert re Mot. for Summ. J. - 11
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

Decl. Joshua Diemert re Mot. for Summ. J. - 11
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

single file line with other co-workers based on how "racist" or "anti-racist" each is in comparison with each other, with one end of the line being "racist" and the other end of the line being "anti-racist." Employees would move around based on the racial stereotypes promoted by RSJI and get behind or in front of other employees. These types of required exercises caused me emotional distress.

41. Another example of these additional training sessions was a 2020 "Theory of Change" workshop I attended, where I was required to evaluate my Department according to the standards described in a document entitled "Characteristics of White Supremacy Culture."

42. When I attended the two-day Undoing Institutional Racism (UIR) workshop to meet my RSJI requirement, I heard trainers say that "white people are cannibals," that "racism is in white people's DNA," and that "white people are like the devil." When I objected at this event, I was mocked by the facilitators of the training and by other coworkers. My coworkers began calling me a "white supremacist." In fact, my supervisor, Ms. Kilpatrick-Goodwill, was not concerned—instead, she seemed amused when she told me that coworkers were still mocking my comments at the UIR workshop. My coworkers continued treating me differently and would call me "racist" and "hateful"—exactly the type of conduct that is encouraged by RSJI.

**Other Incidents of Discrimination**

43. Throughout the entirety of my employment, I also attended meetings where supervisors forced their employees to identify their race and to stand and affirm where they ranked themselves on a defined "continuum of racism." I felt pressured into conforming to some of these exercises for fear of retaliation and hostility from my supervisors and coworkers.

44. In 2017, my co-worker, Consuelo Crow, began a discussion in the lunchroom in which she stated that "white people" are to be blamed for "all atrocities" and that the United States was built upon a system of "white supremacy." She told me that I was "privileged"

Decl. Joshua Diemert re Mot. for Summ. J. - 12
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

and labeled me a "racist" because I favored capitalism. Ms. Crow also said that my words were "violence" and that I was invading her "safe space" because I disagreed with her.

45. In 2020, while I was attempting to cook my food, a group of my co-workers was sitting at one of the few lunchroom tables, openly talking about "white privilege." The group consisted of my supervisor, Ms. Kilpatrick-Goodwill, a supervisor from Seattle City Light, Monica Jones, and other co-workers. I joined their conversation. Members of the group told me that my response was invalid because I was "white" and "did not have a right to speak about black oppression" and that I was attempting to discredit their lived experiences with my "white privilege." They also proceeded to make general disparaging comments about "white people."

46. In June 2021, Race and Social Justice Lead/Chief Equity Officer Edward Odom (Mr. Odom) shared an article regarding Critical Race Theory (CRT) and laws attempting to ban the teaching of it, drawing specific attention towards the 1921 Tulsa Race Massacre. I commented on the post that Mr. Odom shared. Mr. Odom responded to my comment that the reason why anti-CRT legislation is promoted is because a certain group of people "feel guilty." It was clear to me that he was referring to white people. He then sent me an email further attacking me. Mr. Odom shared his criticism of me with many other senior staff members in the IT Department and elsewhere who disparaged me in both public and private. This adverse treatment contrasted with the welcoming reception the City demonstrated towards employees that identified as "BIPOC" whenever such employees would share concerns over City articles, resources, and training. The way the City went out of its way to protect Mr. Said is a powerful example of this discriminatory attitude.

47. Between 2019 and 2020, Shamsu Said, one of my supervisors, repeatedly told me that because I was white, I was to blame for all injustices in the United States. During several of these interactions, Mr. Said would also refer to me as a "colonist" and other racial stereotypes. I would frequently see City employees that self-identified as "BIPOC" refer to white employees as "colonists." Mr. Said also stated in no uncertain terms that I had only reported him for the fraud he was committing against the City because of my "white

Decl. Joshua Diemert re Mot. for Summ. J. - 13
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

privilege." I reported Mr. Said on numerous occasions, but he was never held accountable for his racially discriminatory acts. As a result, in February 2020, Mr. Said escalated his discriminatory conduct—he physically accosted me, got in my face, said I had "white privilege" and proceeded to say that me and "my race" were to blame for the atrocities in the world like slavery and segregation. A true and accurate copy of one of the emails I sent out regarding this incident is attached as **Exhibit 10** to D'Agostino Decl.

48. Despite reporting this incident to numerous HSD management and supervisors, the City did nothing to hold Mr. Said accountable for his discriminatory conduct. After I had reported the incident, the City's first proposal was to move me from my workstation. When I noted that it felt like I was being punished for reporting Mr. Said, they then moved him away from my desk—about eight feet or so. I was still required to work close to him and contrary to the City's assertions, my supervisor, Ms. Kilpatrick-Goodwill, continued to force me to report to him and disclose my personnel information to him. A true and accurate copy of the email I received from Ms. Kilpatrick-Goodwill directing me to include Mr. Said on a leave request is attached as **Exhibit 11** to D'Agostino Decl. This situation caused me emotional distress and I did not feel safe in my work environment, especially after Mr. Said's display of aggression.

49. When I raised my concerns about the racialized training and RSJI material with my supervisor, Ms. Kilpatrick-Goodwill, she retaliated against me by ceasing to support me in resolving technological and logistical issues, as well as cancelling all my meetings with her. I am not aware of any other employee in HSD under Ms. Kilpatrick-Goodwill's supervision that had all their meetings with her cancelled. A true and accurate copy of one of the emails I sent out regarding this incident is attached as **Exhibit 12** to D'Agostino Decl.

50. In January 2021, my supervisor, Ms. Kilpatrick-Goodwill, further retaliated against me because I had filed my EEOC charge on December 23, 2020, and because I had voiced my objections to the City RSJI on numerous occasions, subjecting me to scrutiny which no similarly situated coworker experienced. John Fields, my co-worker, expressed

Decl. Joshua Diemert re Mot. for Summ. J. - 14
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

concern and agreed that I was being targeted by Ms. Kilpatrick-Goodwill. Another co-worker, Rose Long, also supported me and agreed that Ms. Kilpatrick-Goodwill's behavior was retaliatory. A true and accurate copy of some of the emails regarding this incident are attached as **Exhibit 13** to D'Agostino Decl.

### Request to Start a Non-Race-Based Affinity Group

51. On June 21, 2021, I sent Mr. Groce an email detailing my concerns that "all of the Race & Social Justice training (RSJ), including the affinity caucuses, are blatantly racist, stereotype people based on superficial characteristics and apply negative attributes to entire groups of people based off the color of their skin" and expressed my concern about constantly being bombarded with racially denigrating material such that I was not allowed to just do the work I was hired to do. A true and accurate copy of this email is attached as **Exhibit 14** to D'Agostino Decl.

52. In July 2021, I proposed the creation of a non-race-based affinity group that opposes stereotyping people. I was told by Mr. Groce that the affinity group would need to support the City's Race and Social Justice Initiative and that all HSD staff are required to support the goals of the RSJI. He also told me that I needed to reach out to the HSD Change Team. Given that all change teams operate to implement RSJI, I knew that my request would have been automatically denied and I would only incur additional racial harassment.

53. While affinity groups and change teams are voluntary, all of my supervisors were or had been involved in some type of RSJI activity. If you refused to participate, you were targeted as someone to not be promoted. RSJI also teaches that silence contributes to "white supremacy."

### Interference with my FMLA Rights

54. On June 22, 2021, I informed Ryan Groce that the City was not approving my Family and Medical Leave Act leave, and that this issue had been ongoing for about 2 months after I submitted my renewal forms. Human Resources was refusing to accept my doctor's FMLA requests and requiring my doctor to go through excessive steps to get approval.

Decl. Joshua Diemert re Mot. for Summ. J. - 15
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

After having my doctor fill out the requisite forms multiple times, I inquired with Tina Ng-Rudell, who was responsible for processing my FMLA leave request, why the process was much more demanding now when it was not like that when I have requested FMLA leave in the past. Ms. Ng-Rudell angrily told me that she was retracting my FMLA leave that was already certified and will not be processing any of my paperwork. I reported this to the Department of Labor. The Department of Labor investigated this and determined that the City violated my FMLA rights, and summarized these findings in a report. The City's treatment of me and delay of my FMLA leave caused me severe stress and affected my health. A true and accurate copy of my emails recounting my experience with Ng-Rudell and FMLA leave requests is attached as **Exhibit 15** to D'Agostino Decl. A true and accurate copy of the Department of Labor's report regarding the City violating my FMLA rights is attached as **Exhibit 16** to D'Agostino Decl.

**Human Resources Investigation Unit Investigation**

55. I reported racial harassment and discrimination for years to numerous managers and Human Resources Professionals, but the City never conducted any investigation until I filed my EEOC charge.

56. On January 21, 2021, Brandon Kuykendall emailed me with an invitation to meet with the Human Resources Investigation Unit (HRIU) to discuss the issues I raised in my EEOC Complaint against the City of Seattle. I continued to correspond with Mr. Kuykendall and informed him that I was doubtful that the City would take the investigation of my claims seriously or impartially given its failure to do so with my previous complaints. I further raised concerns regarding Mr. Kuykendall's bias and conflict of interest stemming from his membership in the RSJI Change Team. Steve Zwerin then replied to reassure me of the impartiality of HRIU's investigation, and I responded to him with examples of the discriminatory content of RSJI and Mr. Kuykendall's conflict of interest. A true and accurate copy of my email correspondence with Mr. Kuykendall and Mr. Zwerin is attached as **Exhibit 17** to D'Agostino Decl.

Decl. Joshua Diemert re Mot. for Summ. J. - 16
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

57. My fears about the HRIU Investigation being a biased investigation were verified. Whenever I spoke with Mr. Kuykendall, he seemed hostile and disinterested in hearing about my concerns. He also never told me that the investigation would be limited to an 18-month period. He also failed to interview many key witnesses. He consistently tried to narrow the investigation and pretend that my complaints were just about trainings, when it was about the framework of RSJI, how it is embedded into everything, and how it empowered and motivated HSD supervisors and staff to discriminate against me because of my race.

58. Moreover, I know that Mr. Kuykendall met with my union representative, Shaun Van Eyk, to discuss the investigation. I had met with Mr. Van Eyk numerous times to discuss the racially hostile work environment I was experiencing, but none of this evidence made it into the HRUI report, suggesting to me that Mr. Van Eyk also failed to elevate my concerns and share the information he knew with Mr. Kuykendall.

59. When I reviewed Mr. Kuykendall's report, it was clear to me that he failed to incorporate significant information I had relayed to him and that there would be no purpose in contacting him to debrief. I would only subject myself to more hostility and give the City additional opportunities to defend itself and hide evidence.

### Move to Texas

60. As I explained during my deposition, my family and I considered various areas to move to during my employment within the City of Seattle. But until I was constructively discharged by the City, I wanted to resolve things with my employer. I lost a lot moving away from the City—a beautiful home, close friends, and job that allowed me to help and interact with wonderful members of the community. Unfortunately, the City never relented in its racial discrimination. My family's purchase of property in Texas was not the reason why I left my employment. Moreover, my children were also out of school at the time I posted the tweet referenced by the City. I only left my employment because the City brought me to the brink of despair and I could no longer endure working in that environment.

Decl. Joshua Diemert re Mot. for Summ. J.  - 17
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*

**Public Records Requests**

61. During my time as an employee with the City of Seattle, I witnessed supervisors within the City of Seattle destroying internal City documents. I became concerned that I could lose all of the emails and evidence demonstrating my racially hostile work environment. As a result, I made several public records requests to the City. I have received more than one hundred thousand pages of training materials, emails, and documents further corroborating my claims and demonstrating that the hostile work environment I experienced was due to my race. A true and accurate record of all public requests I made to the City are contained in **Exhibit 18** to D'Agostino Decl.

62. As part of the public records requests I have received from the City, there are many complaints and emails from employees also decrying the racially discriminatory environment created by the City. A true and accurate copy of an email sent by a Human Services Department employee discussing the "divisive" nature of RSJI trainings is attached as **Exhibit 19** to D'Agostino Decl.

63. Moreover, I have also received an email in which Mr. Groce is communicating with Tamar Zere, a former RSJI manager. Ms. Zere tells Mr. Groce that a "white person" *could* attend "IRI"—that is, the "Internalized Racial Inferiority" training, but Ms. Zere concluded that "it would be an uncomfortable and unsafe experience for all the participants though." A true and accurate copy of this email is attached as **Exhibit 20** to D'Agostino Decl.

64. In addition to this, there are also emails relating to an incident in which three Ukrainian City employees were forced to leave a "BIPOC" designated training because they had identified as "white" on a separate occasion. True and accurate copies of these emails are attached as **Exhibit 21** to D'Agostino Decl.

65. I have also received clear evidence of the racial division inspired by the City's RSJI. According to an October 26, 2018 memorandum, Terry McLellan, the Human Resources Director, is responding to Latin X, African Descent, and Asian Pacific Islander Caucuses regarding the number of white employees being hired within the Human Services

Decl. Joshua Diemert re Mot. for Summ. J. - 18
2:22-cv-01640-JNW

Pacific Legal Foundation
1425 Broadway, #429
Seattle, Washington 98122
(425) 576-0484

Department. Ms. McLellan goes into extensive detail on the employment statistics and notes all the ways hiring of "white" employees has gone down. A true and accurate copy of this document is attached as **Exhibit 22** to D'Agostino Decl.

### Conclusion

Even after all of this time, it is still my hope that the City of Seattle would stop discriminating against its employees. There are so many vulnerable populations that need access to City services—racial discrimination should play no part in how City employees relate to one another and to their clients. If the City truly wanted to undo institutional racism, it must start with itself and its RSJI.

SIGNED this __6__ day of September, 2024, at __Grand Saline__, __Texas__
                                                                   (city)           (state)

_____
Joshua A. Diemert

Decl. Joshua Diemert re Mot. for Summ. J. - 19
2:22-cv-01640-JNW

*Pacific Legal Foundation*
*1425 Broadway, #429*
*Seattle, Washington 98122*
*(425) 576-0484*